JUDGE DANIELS

**15 CV 3636**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LOCKHEED MARTIN CORPORATION, a
Maryland corporation,

        Plaintiff,

   v.

GLENCORE, LTD., individually and f/k/a,
d/b/a and/or successor in liability to Clarendon,
Ltd.,

        Defendant.



Civil Action No.: _____

**COMPLAINT**

Plaintiff Lockheed Martin Corporation ("Lockheed Martin") brings this Complaint against the above-named Defendant Glencore, Ltd., individually and f/k/a, d/b/a and/or successor in liability to Clarendon, Ltd., and in support thereof alleges the following:

## SUMMARY OF THE CASE

Lockheed Martin brings this action seeking full indemnity from the above-named Defendant, as guarantor of Virgin Islands Alumina Corporation, individually and f/k/a, d/b/a and/or successor in liability to Virgin Islands Alumina, Inc., and Century Aluminum Corporation, (hereinafter collectively "Vialco"), to cover all of Lockheed Martin's past, current and future costs and expenses related to remediation and restoration of the former St. Croix Alumina Facility ("Alumina Facility") on St. Croix, U.S. Virgin Islands. Lockheed Martin seeks indemnification pursuant to the terms of a 1989 Asset Purchase Agreement ("APA") through which Vialco purchased the Alumina Facility from Lockheed Martin's predecessor Martin Marietta. Pursuant to a Guarantee executed on April 26, 1989 ("Guarantee"), the above-named

Defendant stands in the shoes of Vialco.  Copies of the APA and Guarantee are attached to this Complaint as Exhibits 1 and 2.

Of significance to this case, the APA defines the parties' obligations for liabilities arising from environmental conditions existing at or before the closing date of the 1989 sale ("Pre-Closing Environmental Conditions").  The APA states that the parties would share equally any liabilities for Pre-Closing Environmental Conditions exceeding $2 million, but less than $70 million.  The APA makes Vialco solely responsible for liabilities in excess of $70 million and for any environmental conditions created after the closing or that resulted from Vialco's or its affiliates' activities at the Alumina Facility.  Most importantly, the APA states that upon Vialco's sale or transfer of the Alumina Facility to an unrelated third party, Lockheed Martin's obligations under the APA terminate.

As more fully set forth below, liabilities did arise from environmental conditions at the former Alumina Facility, and Vialco did sell the Alumina Facility to an unrelated third party. Pursuant to the plain language of the APA, therefore, all environmental liabilities are the responsibility of the above-named Defendant, as Vialco's guarantor.  Lockheed Martin is entitled to full indemnification for all past, current and future costs and expenses related to the remediation and restoration of the Alumina Facility.

## THE PARTIES

1.      Lockheed Martin is a Maryland corporation with its principal place of business in Bethesda, Maryland.  Lockheed Martin is a global security and aerospace company that is principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products and services.

2.      Lockheed Martin is successor in interest to Martin Marietta Corporation and its subsidiaries Martin Marietta Aluminum, Inc., Martin Marietta Alumina, Inc. and Martin

Marietta Aluminum Properties, Inc. (collectively "Martin Marietta"). Martin Marietta owned the Alumina Facility from approximately 1972 to 1989. It operated the Alumina Facility beginning in approximately 1972 until it ceased operations in 1985.

3.     Upon information and belief, Defendant Glencore, Ltd. was and now is a foreign business corporation with an office and its principal place of business in Switzerland, with an office and place of business at Three Stamford Plaza, 301 Tresser Boulevard, Stamford, Connecticut 06901-3244. Glencore, Ltd. operated as a subsidiary of Glencore plc. Upon information and belief, Clarendon, Ltd. was the name of Glencore Ltd. until 1994, when the name was changed. Defendant Glencore, Ltd., individually and f/k/a, d/b/a and/or successor in liability to Clarendon, Ltd. is hereinafter referred to as "Glencore."

4.     Upon information and belief, Glencore's parent company, Glencore plc, is a significant shareholder of Vialco's parent company, Century Aluminum Company.

5.     Upon information and belief, Glencore is successor to Clarendon, Ltd., the entity that guaranteed Vialco's obligations under the APA, and as such has assumed Clarendon's obligations under the Guarantee.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy, exclusive of interest and costs, exceeds $75,000. This Court has jurisdiction over this declaratory judgment action under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

7.     This Court has personal jurisdiction over Defendant because Defendant transacts business in New York. In addition, the APA and Guarantee, which give rise to this suit, were

negotiated and executed in New York and, upon information and belief, the closing took place at the New York offices of Vialco's and Glencore's counsel, Curtis, Mallet-Prevost, Colt & Mosle.

8.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action are based upon the APA and Guarantee executed in this District and because Defendant has substantial contacts in this District.  Moreover, Defendant expressly agreed, pursuant to Article 17.02 of the APA and the Guarantee (which incorporates Section 17.02 of the APA), that any legal action arising out of or relating to the APA may be instituted in any State or Federal court in the borough of Manhattan, State of New York. The parties to the APA also agreed, pursuant to Article 17.01, that the APA and the rights of the parties under the APA will be governed by and construed in accordance with the laws of the State of New York.

## SUMMARY OF FACTS

### Site History

9.      The Alumina Facility was built in 1965 by Harvey Aluminum Virgin Islands, Inc., a wholly-owned subsidiary of Harvey Aluminum Incorporated.

10.      The Alumina Facility was designed to extract alumina, the intermediate product used in making aluminum, from imported bauxite ore.

11.      The extraction process yielded two primary residual substances, sand and bauxite residue.  The bauxite residue is also known as red mud.

12.      Between 1967 and 1972, the red mud was disposed on a part of the Alumina Facility's property currently known as Area B.  Area B was closed in 1972 and was no longer used for red mud disposal.

13.      In 1972, after Martin Marietta Corporation gained a controlling share in Harvey Aluminum Incorporated, Harvey Aluminum Virgin Islands, Inc. was renamed Martin Marietta Aluminum, Inc.

14.     Martin Marietta began storing the red mud produced as part of its operations on a portion of the property known as Area A.

15.     Martin Marietta processed alumina in the Alumina Facility until May 1985, at which time it shut down the Alumina Facility and ceased refining bauxite ore.

16.     On April 26, 1989, Martin Marietta and Vialco entered into the APA through which Vialco purchased the Alumina Facility from Martin Marietta. Clarendon (now Glencore) unconditionally guaranteed Vialco's APA obligations on the same date. Upon information and belief, Clarendon and its counsel, Curtis, Mallet-Prevost, Colt & Mosle, were intimately involved in the negotiation of the APA and Guarantee.

17.     Vialco processed alumina at the Alumina Facility until 1995. During this period, Vialco deposited all of its red mud in Area A.

18.     In April 1995, Century acquired Vialco, and in July 1995, Vialco sold the Alumina Facility to St. Croix Alumina, L.L.C. ("SCA"), a subsidiary of Alcoa Alumina & Chemicals L.L.C. ("Alcoa").

19.     SCA owned the Alumina Facility between 1995 and 2002, but operated it only between 1998 and 2000. SCA deposited all of its red mud in Area A.

20.     On March 22, 2002, SCA sold the property to St. Croix Renaissance Group, L.L.L.P. ("SCRG"). In connection with its sale of the Alumina Facility property to SCRG, SCA re-graded the red mud piles in Area A. SCRG is the current owner of the property and is redeveloping it. SCRG has never operated the Alumina Facility.

**Claims and Lawsuits Concerning Environmental Conditions**

21.     On March 31, 2000, Lockheed Martin received a letter and draft administrative Order on Consent notifying it that the United States Environmental Protection Agency ("EPA") was preparing to issue an Order against present and former owners and operators of the Alumina

Facility, including Lockheed Martin, to undertake the remediation of certain contamination at the Alumina Facility.

22.     The subject of EPA's concern was a plume of liquid phase separated petroleum hydrocarbons ("PSPH"), also known as oil, floating on top of the groundwater underlying the Alumina Facility.  Samples taken from monitoring wells located on the Alumina Facility indicated that the PSPH was released at various times between 1978 and 1991.

23.     On April 6, 2000, Lockheed Martin notified Vialco of the letter and draft Order on Consent from EPA and informed Vialco that, pursuant to the APA, Vialco must indemnify Lockheed Martin against any liability at issue in the EPA letter/order.

24.     Vialco responded that it was prepared to enter into an administrative Order on Consent with EPA without requiring that Lockheed Martin also join in that Order.

25.     On November 30, 2000, the parties to the EPA's administrative Order on Consent entered into the St. Croix Alumina Facility Site Participation Agreement which established the manner and means by which the parties would (a) undertake to satisfy their obligations pursuant to, and otherwise comply with, the terms of the Order and (b) allocate costs they had incurred and would incur pursuant to the Order and pursuant to the Agreement.  Vialco agreed, in Article 6.4.1 of the Site Participation Agreement, to act as the party responsible for payment on behalf of Lockheed Martin.  Specifically, the Agreement provided that "[i]n consideration of this Agreement, the Parties will look to Vialco and not to Lockheed Martin for payment of all amounts owed by Lockheed Martin pursuant to this Agreement; provided, however, that this agreement to look first to Vialco and not to Lockheed Martin is expressly conditioned upon full and timely payment by Vialco of the monies owed by both Vialco and Lockheed Martin pursuant to this Agreement."  Upon information and belief, Vialco complied with its obligations under Article 6.4.1 of the Site Participation Agreement.

26.     In 2005 and 2007, the Government of the Virgin Islands ("USVI") filed two related lawsuits concerning environmental contamination at the former Alumina Facility for

which it sought remediation and restoration costs: *Comm'r, Dep't of Planning & Natural Res. v. Century Aluminum Co.*, Civil Action No. 1:05-cv-00062-HB (D.V.I. filed May 5, 2005) (the "2005 Action") and *Dep't of Planning & Natural Res. v. St. Croix Renaissance Group, LLLP*, Civil Action No. 1:07-cv-000114-HB (D.V.I. filed Oct. 18, 2007) (the "2007 Action"). Lockheed Martin, as successor to Martin Marietta, Vialco, Century, Alcoa, SCA, SCRG, HOVENSA, LLC ("Hovensa") and Hess Oil Virgin Islands Corporation ("Hovic") were all named as original parties to the 2005 Action. SCRG was the only party originally named to the 2007 Action. On May 26, 2009, SCRG named Lockheed Martin, Century, Vialco, SCA, Alcoa, Hovensa, Hovic and Virgin Islands Port Authority as third-party defendants to the 2007 Action.

27.     The main focus of the suits was the red mud storage areas, A and B, and groundwater under the entire site. The issues raised in the suits relate to both pre-closing and post-closing environmental conditions.

28.     In the 2005 Action, USVI alleged that the defendants were liable for natural resource damages under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (Count VI). There were also five counts under Virgin Islands law: strict liability for an abnormally dangerous activity (Count I); negligence (Count II); negligence per se (Count III); public nuisance (Count IV); and a claim under the Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. § 701, et seq. (Count V).

29.     In the 2007 Action, USVI sought to recover under CERCLA costs for responding to releases or threatened releases of hazardous substances from red mud storage Areas A and B of the Alumina Facility.

30.     On May 19, 2005, after proper and timely notice from Lockheed Martin, Vialco agreed to assume the defense of the 2005 Action on behalf of Lockheed Martin.

31.     Lockheed Martin again notified Vialco of its duty to defend and indemnify Lockheed Martin in a letter dated June 5, 2009, after SCRG named Lockheed Martin as a third-

party defendant in the 2007 Action.  On November 19, 2009, Vialco agreed to assume Lockheed Martin's defense, through joint counsel, in the 2007 Action.

32.     On August 2, 2010, joint counsel advised Lockheed Martin that it should retain its own counsel for its defense in the 2007 Action.  Lockheed Martin again notified Vialco, in letters dated August 4, 2010 and August 6, 2010, of its duty to defend and indemnify Lockheed Martin.

33.     On August 11, 2010, Vialco informed Lockheed Martin that Vialco and Lockheed Martin should no longer be represented by joint counsel in the 2007 Action and that Lockheed Martin should promptly retain its own counsel, for whom Vialco would no longer pay. Vialco advised Lockheed Martin that if Lockheed Martin believed its expenses incurred in defending the 2007 Action were recoverable under the indemnity agreement, Lockheed Martin could submit such expenses to Vialco for review and consideration.  Vialco also ceased its defense of Lockheed Martin in the 2005 Action at this time.  Accordingly, Lockheed Martin was forced to retain and pay new and independent counsel to defend it in the 2005 and 2007 Actions as they were nearing preparation for trial.

34.     On February 16, 2011, Vialco informed Lockheed Martin that it did not have a duty to defend or to reimburse Lockheed Martin for its past or future defense costs with respect to both the 2005 and 2007 Actions.

35.     Alcoa and SCRG settled the 2005 and 2007 actions in 2011.  Alcoa agreed to pay $3,000,000 to the USVI and to remediate Area A.  Vialco and Lockheed Martin did not settle at that time.

36.     In December 2013, USVI, Lockheed Martin and Vialco participated in settlement discussions with the assistance of a court-appointed mediator, but no resolution was reached.

37.     USVI and Lockheed Martin participated in a subsequent mediation in February 2014.  Upon information and belief, Vialco elected not to participate in the February 2014 mediation due to its alleged lack of monetary resources.

38.     USVI and Lockheed Martin agreed in principle to a settlement agreement in the spring of 2014.  Vialco and Glencore were both notified of the settlement before it was finalized.

39.     Lockheed Martin's settlement of the 2005 and 2007 Actions was memorialized in a Consent Decree that was entered by the U.S. District Court for the U.S. Virgin Islands on July 25, 2014.

40.     Lockheed Martin agreed, pursuant to the Consent Decree, to pay USVI $20,750,000.00 to reimburse USVI for Lockheed Martin's share of past and future response costs for remediation/restoration of portions of the site.  Lockheed Martin made that payment on August 22, 2014.

41.     Lockheed Martin also agreed to do substantial future remedial and restorative work on portions of the site, including: (1) stabilizing, contouring, and closing Area B; (2) remediating and closing the Dewatering Pond located within Area B; (3) eliminating the discharge of groundwater containing site-related contaminants into the western and northern portions of the Alucroix Channel; (4) implementing stormwater management facilities; and (5) operating, maintaining, monitoring, and inspecting the remediation/restoration activities undertaken by Lockheed Martin pursuant to the Consent Decree.

42.     Lockheed Martin is now incurring costs for remediation work on the site and has entered into contracts with outside vendors to perform remediation/restoration work in accordance with the Consent Decree.

43.     The United States was not a party to any of the above litigation and has not waived any rights that it may have to seek remediation or restoration costs and/or to require that private parties perform additional remediation and restoration work at the site.

**Glencore Stands in the Shoes of Vialco Pursuant to the Guarantee**

44.     Vialco's obligations under the APA were unconditionally guaranteed by Clarendon (now Glencore) on April 26, 1989, as an inducement for Martin Marietta Corporation to enter into the APA.

45.     The Guarantee provides that "[t]he Guarantor hereby [] unconditionally guarantees, *as primary obligor and not merely as surety*, the timely performance and payment by Vialco of all of Vialco's obligations to [Martin Marietta] under or in connection within the Agreement." (Emphasis added.)  Not only is Glencore 100% liable for Vialco's obligations, therefore, but Lockheed Martin, as successor to Martin Marietta, also may demand performance from Glencore of Vialco's obligations under the APA without first seeking performance from Vialco.

46.     In addition, the Guarantee provides that the "[G]uarantor shall pay to [Martin Marietta] all reasonable costs and expenses, including attorney's fees, incurred by it in enforcing the Agreement or this Guarantee."

47.     The Guarantee further provides that "[t]he obligations of the Guarantor [] shall not in any way be affected, released or exonerated by (i) the taking of or the failure to take any action against VIALCO or Guarantor as the case may be or any other circumstances which might otherwise constitute a legal or equitable discharge or defense of the Guarantor. …"  Thus, Glencore's liability is not contingent upon Vialco's inability to pay.

**Glencore's Indemnification Obligations Under the APA**

48.     Article Ten of the 1989 APA defines Pre-Closing Environmental Conditions and describes the Parties' mutual indemnification obligations should liabilities arise from such Pre-Closing Environmental Conditions at the Alumina Facility site.  Article Sixteen of the 1989 APA addresses how the parties' obligations under the APA would change should Vialco sell the Alumina Facility to a third party (which Vialco did in 1995).  Read together, these Articles of

the APA render Glencore, as Vialco's Guarantor, responsible for all liabilities arising from the Pre-Closing Environmental Conditions at issue in the 2005 and 2007 Actions.  Glencore therefore is obligated to provide Lockheed Martin with a full indemnity for all related costs, fees, and settlement or other payments by Lockheed Martin, including but not limited to the $20.75 million settlement payment to the USVI Government, the costs of complying with the 2014 Consent Order, attorneys' fees, expert costs and other litigation expenses incurred in the defense of the 2005 and 2007 Actions.

49.     Article 10.01 of the APA defines Pre-Closing Environmental Conditions as "[c]onditions existing at or before the Closing, pertaining to surface or subsurface conditions, soil or the groundwater with respect to the Land, to the extent, and only to the extent, that such conditions, pursuant to Legal Requirements as in effect on the Closing Date and applicable to the Assets and the Facility in its shut-down condition:

(i)     require (with or without notice or a Judgment with respect thereto) remedial investigation and/or action and/or suits, actions or other proceedings for remedial action, study or investigation and/or

(ii)    give rise to Judgments, claims, demands, penalties, costs, and/or other liability of any nature of the Purchaser and/or any of Purchaser's Affiliates."

50.     The 2005 and 2007 Actions arise from Pre-Closing Environmental Conditions, in that they seek to redress soil and groundwater contamination at and emanating from the former Alumina Facility, particularly from the red mud storage Areas A and B that Martin Marietta and/or its predecessor used for disposal purposes during their operation of the Alumina Facility.

51.     Article 10.02 of the APA addresses the Parties' mutual indemnification obligations for Pre-Closing Environmental Conditions.  Section 10.02 states:

With respect to Pre-Closing Environmental Conditions, the parties shall have the following responsibilities:  (a) Purchaser shall be responsible for, and shall indemnify, save and hold Seller and its Affiliates harmless

against, the first $1,000,000 arising therefrom (determined in the
aggregate), (b) Seller shall be responsible for, and shall indemnify, save
and hold Purchaser and its Affiliates harmless against, the next $1,000,000
arising therefrom (determined in the aggregate), (c) each of Purchaser and
Seller agrees to be responsible for, and each shall indemnify, save and
hold the other and their respective Affiliates harmless against, 50% of the
amount arising therefrom suffered or incurred in an aggregate amount
exceeding $2,000,000 but less than $70,000,000 and (d) Purchaser shall be
responsible for, and shall indemnify, save and hold Seller and its Affiliates
harmless against the amount arising therefrom which is not otherwise the
responsibility of Seller hereunder (including in respect of Pre-Closing
Environmental Conditions of which Purchaser has not given notice to
Seller within the four-year period as provided in the following sentence).

52.     Article 10.02 also provides that the Seller [Martin Marietta] is responsible for

indemnification only "if and to the extent that, on or prior to the fourth anniversary of the

Closing Date Purchaser [Vialco] shall have given Seller notice" that compliance with legal

requirements mandates remedial investigation and/or an action, or suit or other proceeding has

been filed or commenced against the purchaser.

53.     Specifically, Article 10.02 provides that "Purchaser shall be responsible for, and

shall indemnify, save and hold Seller and its Affiliates harmless against the amount arising

therefrom which is not otherwise the responsibility of Seller hereunder (including in respect of

Pre-Closing Environmental Conditions of which Purchaser has not given notice to Seller within

the four-year period . . .)."  In other words, if no notice of any of the matters for which Lockheed

Martin is seeking indemnity was received within four years of the 1989 Closing Date, and

remedial actions are required, Glencore is responsible for indemnifying Lockheed Martin for any

actions required to be taken.

54.     Vialco did not provide notice of the Pre-Closing Environmental Conditions that

are the subject of the 2005 and 2007 Actions on or before the fourth anniversary of the APA's

Closing Date.  Furthermore, Article 10.02 provides that even if Vialco did provide proper notice

pursuant to the terms of the APA, Glencore still would be responsible for indemnifying

Lockheed Martin for half of its payments relating to Pre-Closing Environmental Conditions up to $70,000,000 and all payments above that amount.

55.    Article 16.02 of the APA states that the APA "shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors and assigns." The APA therefore inures to the benefit of Lockheed Martin as successor to Martin Marietta. Similarly, as successor to Clarendon, Glencore is bound by the provisions of the APA.

56.    Article 16.02 also explicitly states, "Notwithstanding the foregoing, *upon any sale or transfer of the Facility, or any transfer or sale of control of the entity which owns the Facility, to a party which is not an Affiliate of the Purchaser, Seller's obligations (but not its rights) under this Agreement shall terminate*." (Emphasis added.) Thus, if Vialco transferred control of the Alumina Facility to a non-affiliate, Martin Marietta's obligations of indemnification to Vialco would be terminated, but Vialco's obligations to Martin Marietta would survive.

57.    Indeed, Vialco did sell the Alumina Facility to an unaffiliated third party. On July 19, 1995, Vialco sold the Alumina Facility to St. Croix Alumina, a subsidiary of Alcoa. Accordingly, Lockheed Martin's obligations under Article Ten, to the extent any such obligations ever existed, terminated on July 19, 1995. All liabilities relating to Pre-Closing Environmental Conditions therefore properly belong to Glencore.

58.    On or about February 10, 2014 and thereafter, Lockheed Martin notified Glencore that Lockheed Martin expected Glencore to provide indemnification for all of Lockheed Martin's costs related to the defense of the 2005 and 2007 Actions and the remediation and restoration work at the Alumina Facility pursuant to the Guarantee.

59.    Glencore has failed to indemnify Lockheed Martin for any of its costs related to Lockheed Martin's defense and settlement of the 2005 and 2007 Actions.

60.     Specifically, Glencore has refused to indemnify Lockheed Martin for the $20.75 million payment Lockheed Martin made to the U.S.V.I. Government to settle the 2005 and 2007 Actions in violation of Glencore's obligations under Articles Ten and Sixteen of the APA.

61.     Glencore has refused to indemnify Lockheed Martin for all additional amounts Lockheed Martin has paid to meet its obligations under the 2014 Consent Order.

62.     Glencore has refused to indemnify Lockheed Martin for the attorneys' fees it paid to defend the 2005 and 2007 Actions since August 2010 after Vialco dropped its defense of Lockheed Martin in the 2005 and 2007 Actions.

## COUNT I: BREACH OF CONTRACT

63.     Lockheed Martin repeats, realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

64.     Martin Marietta and Vialco willingly and purposefully entered into the APA, a valid agreement concerning the sale of the Alumina Facility to Vialco, on April 26, 1989.

65.     In the Guarantee dated April 26, 1989, Clarendon (now Glencore) expressly promised to act as Guarantor of Vialco's financial obligations under the APA.

66.     Lockheed Martin, as successor to Martin Marietta, performed all of its duties and obligations under the APA.

67.     Because Vialco sold the Alumina Facility to an unrelated third party in July 1995, Lockheed Martin's obligations under the APA, including any obligation to indemnify Vialco for any liabilities related to Pre-Closing Environmental Conditions, terminated in July 1995. Glencore therefore is solely responsible for all liabilities relating to Pre-Closing Environmental Conditions, including providing a full indemnification to Lockheed Martin for all costs, expenses, fees, and other amounts Lockheed Martin has paid and has been required to pay related to Pre-Closing Environmental Conditions.

68.     Pursuant to Article 10.03 of the APA, Glencore is obligated to indemnify Lockheed Martin for all other costs related to environmental conditions at the Alumina Facility site that were not Pre-Closing Environmental Conditions.

69.     All amounts that Lockheed Martin has paid in the defense and settlement of the 2005 and 2007 Actions and to otherwise comply with the Consent Order are related to environmental conditions at the Alumina Facility site and are subject to Glencore's indemnification obligations.

70.     Glencore breached its obligations under the Guarantee and Articles 10.02, 10.03 and 16.02 of the APA by failing to fully indemnify Lockheed Martin for any and all costs Lockheed Martin incurred related to the defense of the 2005 and 2007 Actions, including but not limited to costs to comply with the 2014 Consent Order, attorneys' fees, expert costs, settlement payments, and other litigation expenses.

71.     As a result of Glencore's breach, Lockheed Martin has been damaged in an amount to be determined at trial but including: a) all of its costs defending the 2005 and 2007 Actions; b) the cash payment to settle the 2005 and 2007 Actions; c) all of its costs to perform remediation/restoration of the Alumina Facility; d) all of the costs it will incur to pay for remediation/restoration in the future related to the Alumina Facility; e) all of its costs incurred in enforcing the APA and bringing this suit; and f) any other damages incurred as a result of Glencore's breach.

## COUNT II: BREACH OF GUARANTEE AGAINST GLENCORE

72.     Lockheed Martin repeats, realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

73.     Vialco is obligated under the APA to indemnify Lockheed Martin for any and all costs Lockheed Martin incurs related to the defense of any suits brought against Lockheed

Martin concerning environmental conditions at the Alumina Facility and any remediation/restoration costs associated with any such conditions.

74. Vialco has breached its obligations under Articles 10.02, 10.03 and 16.02 of the APA by failing to fully indemnify Lockheed Martin.

75. Glencore voluntarily and expressly promised to act as Vialco's Guarantor and provided an absolute and unconditional guarantee of Vialco's indemnity obligations under the APA.

76. Lockheed Martin has incurred significant costs related to remediation/restoration of the Alumina Facility.

77. All such past costs and those which may be expended in the future by Lockheed Martin related to remediation/restoration of the Alumina Facility represent a debt of Vialco and Glencore which Lockheed Martin has paid and will continue to pay until Glencore performs pursuant to its Guarantee.

78. Glencore breached its Guarantee dated April 26, 1989 by failing to perform and fulfill its obligations as Vialco's Guarantor to indemnify Lockheed Martin.

79. As a direct and proximate result of Glencore's breach of the Guarantee, Lockheed Martin has been damaged in an amount to be determined at trial but including: a) all of its costs defending the 2005 and 2007 Actions; b) the cash payment to settle the 2005 and 2007 Actions; c) all of its costs to perform remediation/restoration of the Alumina Facility; d) all of the costs it will incur to pay for remediation/restoration in the future related to the Alumina Facility; e) all of its costs incurred in enforcing the APA and bringing this suit; and f) any other damages incurred as a result of Vialco's breach of the APA and Glencore's breach of the Guarantee.

## COUNT III: DECLARATORY JUDGMENT – CONTRACTUAL INDEMNIFICATION OBLIGATIONS AND GUARANTEE

80.     Lockheed Martin repeats, realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

81.     Vialco has breached its obligations under Articles 10.02, 10.03 and 16.02 of the APA by failing to fulfill its obligations to indemnify Lockheed Martin.

82.     Glencore provided a Guarantee of all of Vialco's obligations under the APA.

83.     Glencore is obligated to Lockheed Martin as guarantor of Vialco's indemnification obligations under the APA.

84.     Glencore has breached its Guarantee of Vialco's obligations.

85.     Lockheed Martin is entitled to a declaratory judgment that because of the Guarantee, Glencore stands in the shoes of Vialco and is obligated to indemnify Lockheed Martin pursuant to the APA; that Glencore has breached its obligations under the APA and that Glencore is obligated to indemnify Lockheed Martin for any and all costs Lockheed Martin has incurred related to the defense and settlement of the 2005 and 2007 Actions.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Lockheed Martin demands judgment as follows:

A.     As to Count I, award judgment for Plaintiff Lockheed Martin and against Glencore for the damages resulting from Glencore's breach of contract in an amount to be proven at trial but no less than all past and future costs incurred by Lockheed Martin in relation to environmental conditions at Alumina Facility including attorneys' fees, expert costs and other costs to defend the 2005 and 2007 Actions;

B.     As to Count II, award judgment for Plaintiff Lockheed Martin and against Glencore resulting from Glencore's breach of Guarantee for damages in an amount to be proven at trial but no less than all past and future costs incurred by Lockheed Martin

in relation to environmental conditions at the Alumina Facility including attorneys' fees, expert costs and other costs to defend the 2005 and 2007 Actions;

C.  As to Count III, enter a declaratory judgment for Plaintiff Lockheed Martin and against Glencore declaring and decreeing that Vialco has breached its obligations under the APA and that Glencore is obligated to indemnify Lockheed Martin pursuant to its Guarantee of Vialco's obligations under the APA.

D.  Award Plaintiff Lockheed Martin its attorneys' fees and costs incurred in connection with this action; and

E.  Award Plaintiff Lockheed Martin such other and further relief as the Court deems just and proper.

Dated: _____5/11/15_____

_____

BEVERIDGE & DIAMOND, P.C.
John S. Guttmann (JG 7601)
Paula J. Schauwecker, (PS 3449)
477 Madison Avenue, 15th Floor
New York, NY 10022
Tel: (212) 702-5400 / Fax: (212) 702-5450
JGuttmann@bdlaw.com
PSchauwecker@bdlaw.com

Robert Brager, (RB 4196)
201 North Charles Street, Suite 2210
Baltimore, MD 21201
Tel: (410) 230-1310 / Fax: (410) 230-1389
RBrager@bdlaw.com

*Counsel for Lockheed Martin Corporation*

Exhibit 1

ASSET PURCHASE AGREEMENT

AGREEMENT dated as of April 26, 1989 between MARTIN MARIETTA ALUMINUM PROPERTIES, INC., a Delaware corporation ("Seller"), and VIRGIN ISLANDS ALUMINA, INC., a United States Virgin Islands corporation ("Purchaser").

W I T N E S S E T H :

WHEREAS:

(a)  Seller is the owner of the Assets (defined in Section 1.02 hereof), which were used by Seller in the operation of an alumina refinery located in St. Croix, United States Virgin Islands, commonly known as "The Martin Marietta Alumina Refinery";

(b)  Seller desires to sell, and Purchaser desires to buy, the Assets as of the Closing (defined in Section 1.05 hereof) on the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the respective covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE ONE
DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated below:

1.01 "Affiliate" shall mean, with respect to any entity, any other entity directly or indirectly controlling, controlled by or under common control with such entity. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities or otherwise.

1.02 "Assets" shall mean the Land, the Improvements, Records, the Facility Permits (but only to the extent assignable pursuant to the terms thereof), Inventory (if any), Facility Intellectual Property and Facility Equipment.

1.03 "Bill of Sale" shall have the meaning set forth in Section 3.01.

1.04 "CFC" shall mean CFC International V.I., Inc., a Delaware corporation.

1.05 "Closing" shall have the meaning set forth in Section 9.01.

1.06 "Closing Date" shall mean the date on which the Closing occurs.

1.07 "Contract Assignment" shall have the meaning set forth in Section 3.01.

1.08 "Contracts" shall mean any and all contracts, agreements, franchises, understandings, arrangements, leases, licenses, mortgages, bonds, notes, guaranties, warranties and other similar instruments, excluding any and all Permits.

1.09 "Deed" shall have the meaning set forth in Section 3.01.

1.10 "Disclosure Schedule" shall mean the Schedule which has been prepared by Seller and delivered to Purchaser upon the execution and delivery hereof.

1.11 "Employee Benefit Plan" shall mean any and all pension, profit-sharing, retirement, fringe benefit, deferred compensation, stock purchase, stock option, incentive, bonus, vacation, severance, disability, hospitalization, medical insurance, life insurance or any other type of employee benefit plan, program or arrangement within the meaning of Article 3 of the Employee Retirement Income Security Act of 1974, as amended.

1.12 "Environmental Report" shall have the meaning set forth in Section 8.02(r).

2

1.13 "Equipment" shall mean all furnishings, furniture, fittings, equipment, machinery, apparatus, appliances, trucks, automobiles, other vehicles, signs, spare parts, fuel, operating supplies, pipelines, conveyers, mills, heaters, flush tanks, pumps, rakes, filters, thickeners, cranes, kilns, evaporators, turbines, generators, pulverizers, boilers, tools, dies, jigs, patterns, molds and other articles of personal property of every kind whatsoever, except to the extent any such item constitutes an Improvement.

1.14 "Facility" shall mean that certain alumina refinery and all related facilities, Improvements and Facility Equipment commonly known as "The Martin Marietta Alumina Refinery" situated on the Land.

1.15 "Facility Employees" shall mean persons employed by Seller or any Affiliate or predecessor of Seller with respect to the Facility or any of the Assets at any time prior to Closing, irrespective of whether any such person is employed by Seller or any of its Affiliates on the date hereof or on the Closing Date.

1.16 "Facility Equipment" shall mean all Equipment located on the Land on the Closing Date and used or usable in connection with the Facility except (i) any Equipment owned by CFC within that certain ethanol refinery constructed by CFC on the Land, (ii) certain office furniture owned by CFC and located on the Land and (iii) as otherwise set forth in the Disclosure Schedule.

1.17 "Facility Intellectual Property" shall mean any and all patents, trade secrets, proprietary information, computer software and (to the extent related to such computer software) copyrights currently held by Seller or its Affiliates and which were used by Seller and are necessary to operate the Facility (other than any such items related to general administrative or accounting operations) including, but not limited to, the rights granted to Martin Marietta Aluminum, Inc. ("MMA") under that certain Know-How License and Technical Assistance Agreement dated April 22, 1982 between MMA and Sumitomo Aluminum Smelting Company, Limited (the "Know-How License Agreement") and the computer program used to operate the red mud digest process of the Facility.

3

1.18 "<u>Facility Permits</u>" shall mean any and all unexpired Permits which are held by or issued to Seller or any of its Affiliates which are used or intended for use in connection with the Assets.

1.19 "<u>FIP Assignment</u>" shall have the meaning set forth specified in Section 3.01.

1.20 "<u>H-S-R Act</u>" shall have the meaning set forth in Section 4.01(d).

1.21 "<u>Improvements</u>" shall mean all buildings, structures, fixtures and improvements located on the Land, including, but not limited to, refineries, desalination facilities, port facilities, power plants, maintenance and repair facilities and administrative offices; excluding, however, the structures, fixtures and improvements consti-tuting that certain ethanol refinery constructed by CFC.

1.22 "<u>Inventory</u>" shall mean all of the product inventory owned by Seller or any of its Affiliates in connection with the Facility, including, without limita-tion, raw materials and work in process.

1.23 "<u>Know-How License Agreement</u>" shall have the meaning set forth in Section 1.17 hereof.

1.24 "<u>Judgments</u>" shall mean any and all judg-ments, orders, directives, injunctions, writs, decrees, stipulations or awards of any federal, USVI, state, local or foreign court, arbitrator or administrative or govern-mental authority, bureau or agency having or asserting jurisdiction over Seller or any of the Assets.

1.25 "<u>Land</u>" shall mean any and all of the real property described on Exhibit 1.25 hereto, together with all easements, rights of way or use, privileges, licenses, appurtenances and rights belonging or appertaining thereto.

1.26 "<u>Legal Requirements</u>" shall mean any and all applicable (i) federal, USVI, state and local laws (statu-tory, judicial or otherwise), regulations, rules, orders and ordinances; (ii) Judgments; and (iii) Permits.

1.27 "<u>Liens</u>" shall mean any and all liens (including, but not limited to, Monetary Liens),

easements, mortgages, deeds of trust, charges, security interests, Judgments affecting the use of Property, conditions, encumbrances or other restrictions or limitations of a similar nature.

1.28 "Monetary Liens" shall mean any mortgage, deed of trust, security agreement or other agreement or instrument securing a loan to Seller or any of its Affiliates and filed with any governmental authority and constituting a public record which encumbers all or part of the Assets.

1.29 "New Survey" shall have the meaning set forth in Section 3.03.

1.30 "PCBs" shall have the meaning set forth in Section 10.03.

1.31 "PCB Transformers" shall have the meaning set forth in Section 10.03.

1.32 "Permits" shall mean any and all permits, authorizations, approvals, registrations, certificates of completion, orders or other approvals or licenses granted by any federal, USVI, state, local or foreign administrative or governmental authority, bureau or agency under any (a) federal, USVI, state, local or foreign statute, ordinance or regulation, (b) Judgment or (c) Contract with any federal, USVI, state, local or foreign court, arbitrator or administrative or governmental authority, bureau or agency relating to compliance with matters described in (a) or (b) above.

1.33 "Permitted Exceptions" shall mean, (a) with respect to each parcel of real estate constituting part of the Land and the Improvements thereon, the Liens disclosed on the Title Report (or update or continuation thereof) relating to such tract or parcel of real estate and not disapproved by Purchaser pursuant to Section 3.02 and such other Liens disclosed on the Title Report (or update or continuation thereof received prior to Closing) which Purchaser in good faith determines are not materially adverse to Purchaser's ownership and operation of the Assets, and (b) with respect to Assets other than the Land and Improvements, the Liens specifically disclosed on the Disclosure Schedule with respect thereto and specifically referred to therein as Permitted Exceptions.

1.34 "Pre-Closing Environmental Conditions" shall have the meaning set forth in Section 10.01.

1.35 "Properties" shall mean any and all properties, rights and assets (real, personal or mixed, tangible or intangible).

1.36 "Purchase Price" shall have the meaning set forth in Section 2.03.

1.37 "Purchaser" shall have the meaning set forth in the first paragraph of this Agreement.

1.38 "Records" shall mean all records, instruments and documents owned by Seller or any of its Affiliates located on the Land however kept (whether written, on computer tape, discs, software or otherwise) pertaining to the operation of the Assets.

1.39 "Seller" shall have the meaning set forth in the first paragraph of this Agreement.

1.40 "Taxes" shall have the meaning set forth in Section 4.01(r).

1.41 "Title Company" shall have the meaning set forth in Section 3.02.

1.42 "Title Policy" shall have the meaning set forth in Section 3.02.

1.43 "Title Report" shall have the meaning set forth in Section 3.02.

1.44 "USVI" shall mean the United States Virgin Islands.

ARTICLE TWO
TERMS OF SALE AND PAYMENT

2.01 Sale of Assets. Seller agrees, upon the terms and subject to the conditions hereinafter set forth, to sell, convey, assign, transfer and deliver or cause to be sold, conveyed, assigned, transferred and delivered to Purchaser, the Assets, AS IS. THE SOLE REPRESENTATIONS AND WARRANTIES OF SELLER ARE SET FORTH IN THIS AGREEMENT.

6

THERE ARE NO REPRESENTATIONS OR WARRANTIES OF SELLER OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, FITNESS OR CONDITION OF THE FACILITY OR ANY OF THE ASSETS. Since the Facility is being sold "AS IS" it is the total responsibility of the Purchaser to renovate the Facility and make such improvements as are necessary for its proper operation. Nothing in this Agreement should be construed or interpreted as the Seller's agreement to participate in any capital improvements necessary for the Facility to function properly or to comply with any existing or future laws; provided, however, that this paragraph is not intended to relieve Seller of its obligations for remediation of Pre-Closing Environmental Conditions. Seller shall transfer the Facility Permits to the extent assignable, the Facility Equipment, the Facility Intellectual Property, Inventory and Records free and clear of all Liens, other than the Permitted Exceptions.

2.02  <u>Purchase of Assets</u>. Purchaser agrees to purchase all, but not less than all, the Assets and Seller's rights under the Contracts listed in Part 3 of the Disclosure Schedule, and to assume Seller's obliga- tions, if any, under such Contracts, upon the terms and subject to the conditions hereinafter set forth. Notwith- standing any other provision of this Agreement, Purchaser does not assume any obligation in respect of such Contracts other than the obligation to render performance in accordance with their terms.

2.03  <u>Purchase Price</u>. Purchaser agrees to pay to Seller as the complete purchase price for the Assets the aggregate sum of FORTY-FIVE MILLION U.S. DOLLARS (U.S $45,000,000) (the "Purchase Price"). The Purchase Price, as adjusted pursuant to Sections 8.03 and 9.04, shall be payable at Closing by wire transfer of immediately avail- able funds to such account as Seller shall designate by written notice delivered to Purchaser at least two (2) business days prior to the Closing.

ARTICLE THREE
<u>TITLE TO FACILITY</u>

3.01.  <u>Title</u>.  At the Closing, Seller shall convey to Purchaser (a) title to the Land and Improvements by a Quitclaim Deed or Deeds in the form of Exhibit 3.01(a) attached hereto (collectively, the "Deed"), duly

7

executed and acknowledged in proper statutory form for recording, (b) title to the Inventory, Records and certain Facility Equipment and Facility Intellectual Property at the Closing by a bill of sale and assignment of assets in the form of Exhibit 3.01(b) hereto (the "Bill of Sale"), (c) title to certain Facility Intellectual Property by an Assignment in the form of Exhibit 3.01(c) hereto (the "FIP Assignment"), (d) an assignment of its rights to the Contracts listed in Part 3 of the Disclosure Schedule by an Assignment and Assumption in the form of Exhibit 3.01(d) hereto (the "Contract Assignment"), and (e) title to vehicles by a bill of sale accompanied by proper endorsement of the vehicle registration slips issued by the USVI Department of Public Safety.

3.02.     Title Commitment; Defects.  As soon as practicable after the date hereof, Seller shall use reasonable efforts to obtain at its sole cost and expense, and provide a copy to Purchaser of, (a) a title commitment with respect to title to the Land and Improvements (or if Purchaser agrees, the portion of the Land and Improvements south of the four lane highway running east-west through the northern portion of the Land) for an ALTA Owner's Policy of Title Insurance on ALTA Form B-1987 - Extended Coverage from Chicago Title Insurance Company, acting in its capacity as title insurer, or, if such company shall be unwilling to issue the Title Policy (as hereinafter defined), Purchaser shall be permitted to obtain the Title Policy from any nationally recognized title company (Chicago Title Insurance Company or its replacement is herein called the "Title Company") and (b) true and complete copies of all recorded instruments encumbering the Land or Improvements (together the "Title Report") prepared and delivered by the Title Company.

Purchaser shall notify the attorneys for Seller in writing of any defects or objections to title as set forth in the Title Report or in the New Survey to which Purchaser objects within five (5) business days after the later of (a) Purchaser's receipt of the Title Report or (b) Purchaser's receipt of the New Survey.  Thereafter, Purchaser will notify the attorneys for Seller in writing of any new defect or objection to any new matter set forth in any update or continuation of the Title Report within five (5) business days of Purchaser's receipt of the same. Failure of Purchaser to notify Seller within such period of any title defects or objections as aforesaid shall

constitute Purchaser's acceptance of such defects or objections.

Seller shall be obligated to cure (or, with respect to Liens in an ascertainable amount (other than Monetary Liens) to provide Purchaser with an indemnification acceptable to Purchaser with respect thereto) any title defect or objection which is a lien resulting from a loan or a charge in a fixed or ascertainable amount at or prior to Closing. As a condition to the Closing, the Title Company shall, at Seller's cost and expense, issue to Purchaser an ALTA Owner's Policy of Title Insurance on ALTA Form B-1987-Extended Coverage, or a commitment therefor, in the amount of the Purchase Price (or such lesser amount as Purchaser shall specify), which shall provide that the standard survey and lien exceptions will be removed, shall indicate that fee simple title is vested in Purchaser, free and clear of all Liens except the Permitted Exceptions and shall contain a survey endorsement reflecting the New Survey and endorsements for an ALTA Facultative Re-Insurance Agreement with such re-insurers as Purchaser shall reasonably request (the "Title Policy").

3.03.  Survey.  As soon as practicable, Seller shall, at Seller's sole expense, deliver to Purchaser an updated and certified survey (the "New Survey") of the Land and Improvements as they presently exist indicating thereon the legal description of the Land (including the boundaries of all interior parcels), and delineating the boundary lines of the Land, rights of way (both recorded and unrecorded), roads, sewer lines, utility lines, water lines and easements, contiguous public roads and encroachments by the Improvements or other improvements on any of the foregoing. If such legal description varies from that set forth in Exhibit 1.25 in a way which Purchaser in good faith determines would materially and adversely affect Purchaser's ownership or operation of the Assets, Purchaser may at its election terminate this Agreement. Upon such delivery, the New Survey shall be deemed to be a part hereof and incorporated by reference herein.

9

ARTICLE FOUR
REPRESENTATIONS AND WARRANTIES OF SELLER

4.01   Subject to the exceptions set forth in the Disclosure Schedule, in order to induce Purchaser to enter into this Agreement, Seller hereby makes the following representations and warranties to Purchaser and its successors and assigns:

(a)   Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, duly qualified to do business as a foreign corporation and in good standing in the USVI.  Seller has all necessary corporate power and authority to own its Properties and to carry on the business presently conducted by it.

(b)   Authority and Enforceability.  Seller has full corporate power and authority to enter into this Agreement and perform its obligations hereunder.  This Agreement has been duly and validly authorized by all necessary corporate action of Seller and has been duly executed and delivered by duly authorized officers of Seller.  This Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the terms hereof, subject as to enforceability to (i) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights and (ii) general princ- iples of equity.

(c)   No Breach.  Neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the transactions contemplated hereby, does or will (i) violate, conflict with, result in or constitute a breach of or default under the Certificate of Incorpora- tion or By-laws of Seller or (ii) result in the creation of any Lien upon any of the Assets under any of the terms, conditions or provisions of any Contract affecting any of the Assets to which Seller or any of its Affiliates is a party, or by which Seller, any of its Affiliates or any of the Assets may be bound or affected, or result in the termination of or accelerate performance under any such Contracts that Purchaser will assume the obligation to perform pursuant to Section 2.02 hereof, or (iii) violate any Legal Requirement applicable to Seller, any of its Affiliates or any of the Assets.

10

(d)  Consents.  Except for the notific
required under the Hart-Scott-Rodino Antitrust Improv
ments Act of 1976 (the "H-S-R Act") and the approval
the Environmental Protection Agency and/or the USVI
Department of Planning and Natural Resources (if
required), to the best knowledge of Seller and its
Affiliates, no consent, authorization, order or appro
of, or filing or registration with, the government of
USVI, the U.S. government, or any federal, USVI, stat
local or foreign governmental commission, board or an
other regulatory body which has not been obtained or
will be required for or in connection with the execu
and delivery of this Agreement by Seller or the conve
of the Assets by Seller.

(e)  Assets.  Seller is the sole and
exclusive owner of, and has good and marketable titl
all the Facility Equipment, Facility Intellectual
Property, Inventory (if any), and Records free and c
of all Liens, except for (i) as of the date of this
Agreement, those matters set forth in the Disclosure
Schedule as exceptions to title and such other Lien:
are not material and would not materially and advers
interfere with the ownership or operation of the As:
and (ii) as of Closing, the Permitted Exceptions.
assignment, transfer, conveyance and delivery of the
Assets by Seller to the Purchaser at the Closing wi:
in the Purchaser absolute, good and marketable titl
the Facility Equipment, Facility Intellectual Prope
Inventory, and Records free and clear of all Liens,
for the Permitted Exceptions.  No Affiliate of Sell
any third person, other than CFC and contractors re
by Purchaser, owns any Properties (i) located on th
or (ii) which were used by Seller or any of its Aff
in the operation of the Facility.

(f)  Description of Property.  To th
knowledge of Seller and its Affiliates, Exhibit 1.2
contains a substantially complete and accurate leg:
description of each parcel of real property includ:
the Land that will be included in the New Survey t
duly registered with the USVI Department of Public
prior to Closing.  The Land constitutes all real p
to which Seller believes it has an ownership inter
is used by Seller or any of its Affiliates in conn
with the operation of the Facility or upon which a
the Assets are affixed or situated.

.on

1
he

.de
.n
.nce

:o,

ar

nich
y
.s

vest
:o
:,
:cept
or
.ned
.and
iates

best

in
e
rks
erty
: or
:ion
of

(g) <u>Facility Permits</u>.   The Disclosure Schedule lists all Facility Permits and all pending applications of Seller or its Affiliates therefor.  To the best knowledge of Seller and its Affiliates, no Facility Permits have expired and all Facility Permits are in full force and effect.  No proceeding is pending or to the best knowledge of Seller and its Affiliates, threatened, to suspend, revoke, withdraw, terminate or otherwise limit any of the Facility Permits.

(h) <u>Contracts</u>.  Neither Seller nor any of its Affiliates is with respect to any of the Assets a party to, nor are any of the Assets bound by or subject to, any Contracts, whether written or oral.

(i) <u>Leases</u>.  Neither Seller nor any of its Affiliates is a lessee or lessor under any lease of real or personal property relating to the Assets, including, but not limited to, any lease of Equipment.

(j) <u>Inventory</u>.  The Inventory constitutes all product inventory (including, without limitation, raw materials and work in process), if any, located on the Land relating to the Facility other than product inventory owned by CFC, if any.

(k) <u>Equipment</u>.  The Facility Equipment constitutes all Equipment which on October 31, 1988 was (i) owned by Seller or any of its Affiliates and (ii) located on the Land, other than items of Equipment which, in the aggregate, do not have a fair market value of more than $100,000.

(l) <u>Facility Intellectual Property</u>.  To the best knowledge of Seller and its Affiliates, all Facility Intellectual Property is listed on the Disclosure Schedule.  Seller owns or has a royalty free, perpetual, freely assignable license to use all the Facility Intellectual Property listed on the Disclosure Schedule.  No additional royalty or other payment will become due under the Know-How License Agreement as a result of Purchaser's operation of the Facility.  With respect to the Assets and the Facility, except as set forth on the Disclosure Schedule, Seller does not use in connection with the Assets, and has not in the past seven (7) years used in connection therewith, any patent or patent application, copyright, trade secret or other proprietary right of any

12

third party.  Perpetual, royalty free licenses (or assign-
ment of licenses to Seller) of each item of the Facility
Intellectual Property are included in the Assets.

(m)  Compliance With Legal Requirements.
To the best knowledge of Seller and its Affiliates, since
January 1, 1982, neither Seller nor any of its Affiliates
has received any citation, complaint, consent order,
compliance schedule, demand, notice of any pending viola-
tion or claimed violation or other similar enforcement
order claiming, asserting or indicating that Seller, any
of its Affiliates, the Assets, or the operations of the
Facility are not in compliance with or violate any Legal
Requirements pertaining to the Assets or the operation of
the Facility, other than any such item received from the
Equal Employment Opportunity Commission.

(n)  Union Obligations.  All collective
bargaining agreements entered into by Seller or any of its
Affiliates or predecessors within the past seven years
with respect to any Facility Employees and the date of
expiration or other termination of each such agreement are
set forth on the Disclosure Schedule.

(o)  Employee Benefit Matters.  Neither
Purchaser nor any of its Affiliates will, as a result of
this Agreement or the transactions contemplated hereby,
have, nor will any of the Assets be liable for or subject
to any Lien with respect to, (a) any liability or obliga-
tion (whether on an active or frozen basis) with respect
to any Employee Benefit Plan of Seller or any of its
Affiliates or for the benefit of any Facility Employee or
(b) any obligation to any Facility Employee, or any of
their beneficiaries other than any such liability relating
to Purchaser's employment of any Facility Employee.

(p)  Absence of Certain Changes.  Since
October 31, 1988, (i) there has been no loss, damage to or
destruction of the Assets (which in the aggregate are
material to the value or use of the Assets, whether or not
covered by insurance) and (ii) to the best knowledge of
Seller and its Affiliates, no Properties owned by Seller
or any of its Affiliates in excess of $100,000 in the
aggregate have been removed from the Land.

13

(q)  Documents.  Seller has delivered to Purchaser and its counsel true and correct copies of each of the following documents and materials:

(i)  all Contracts listed on the Disclosure Schedule;

(ii)  all Facility Permits; and

(iii)  the most recent property tax bills with respect to each parcel included in the Land.

(r)  Government Reports and Returns; Taxes. No real estate assessments are outstanding, nor has Seller or any of its Affiliates received any notice that any such imposition may be imposed, with respect to the Assets. There will be no deficiencies, penalties or other amounts assessed with respect to federal, USVI, state, local or foreign tax returns and tax reports with respect to periods prior to the Closing (collectively "Taxes") for which any of the Assets will be subject to any Lien or for which Purchaser will be liable as successor in interest to Seller.

(s)  Pending Claims.  There is no litiga-tion, proceeding, action, suit, investigation, arbitra-tion, claim or dispute pending before any federal, USVI, state, municipal, or other governmental court, department, commission, agency or instrumentality, domestic or foreign, or arbitration panel, or, to the best knowledge of Seller and its Affiliates, threatened, at law or in equity, against Seller or any of its Affiliates which (i) might affect the Assets or (ii) might enjoin any of the transactions contemplated hereby.

(t)  Material Misstatements or Omissions. To the best knowledge of Seller and its Affiliates, no representation or warranty of Seller made in this Agree-ment or in any exhibit, schedule or certificate, furnished or to be furnished to Purchaser pursuant hereto or in connection with the transactions contemplated hereby, when considered together with all other representations and warranties of Seller made herein or in any such exhibit, schedule or certificate and information otherwise known to Purchaser and its Affiliates, contains or will contain any untrue statement of a material fact or omits or will omit a material fact the inclusion of which is required to make

14

the statements contained herein or therein, in light of the circumstances under which they were or will be made, not misleading.

## ARTICLE FIVE
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

5.01  Purchaser hereby makes the following representations and warranties to Seller, its successors and assigns:

(a)  Organization.  Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the USVI.

(b)  Authority.  Purchaser has all necessary corporate power and authority to own its Properties and to carry on the business presently conducted by it.  Purchaser has full corporate power and authority to enter into this Agreement and perform its obligations hereunder.  This Agreement has been duly and validly authorized by all necessary corporate action of Purchaser and has been duly executed and delivered by duly authorized officers of Purchaser.

(c)  Enforceability.  This Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with the terms hereof, subject as to enforceability to (i) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors rights and (ii) general principles of equity.

(d)  Consents.  Except for the notification required under the H-S-R Act and the approval of the Environmental Protection Agency and/or the USVI Department of Planning and Natural Resources (if required), to the best knowledge of Purchaser and its Affiliates, no consent, authorization, order or approval of, or filing or registration with, the government of the USVI, the U.S. government, or any federal, USVI, state, local or foreign governmental commission, board or any other regulatory body which has not been obtained or made will be required for or in connection with the execution or delivery of this Agreement by Purchaser or the conveyance of the Assets to Purchaser.

15

(e) <u>No Breach</u>.  The execution, delivery and performance by Purchaser of this Agreement does not and will not (i) violate, conflict with, result in or constitute a breach of or default under the Certificate of Incorporation or By-Laws of Purchaser; or (ii) violate any Legal Requirement applicable to Purchaser or any of its Affiliates.

(f) <u>Purchaser's Diligence Regarding Assets</u>.  Purchaser has had the opportunity to inspect the Facility and the Assets, has inspected and is thoroughly familiar with the same, has made such inquiries of third parties and has conducted such other due diligence as it has deemed necessary prior to entering into this Agreement and has determined that the Facility and Assets are suitable for their intended use, provided that such inspection shall not affect nor diminish the parties' obligations set forth in Article Ten hereof.

(g) <u>Material Misstatements or Omissions</u>.  To the best knowledge of Purchaser and its Affiliates, no representation or warranty of Purchaser made in this Agreement or in any exhibit, schedule or certificate furnished or to be furnished to Seller pursuant hereto or in connection with the transactions contemplated hereby, when considered together with all other representations and warranties of Purchaser made herein or in any such exhibit, schedule or certificate and information otherwise known to Seller and its Affiliates, contains or will contain any untrue statement of a material fact the inclusion of which is required to make the statements contained herein or therein, in light of the circumstances under which they were or will be made, not misleading.

<u>ARTICLE SIX</u>
<u>SELLER'S OBLIGATIONS BEFORE CLOSING</u>

6.01 <u>Seller's Covenants</u>.  Seller agrees that from the date of this Agreement until the Closing:

(a) <u>Access to Information</u>.  Seller and its Affiliates shall use their best efforts to give Purchaser and its counsel, accountants, consultants and other representatives, upon reasonable request, full access during normal business hours to all Properties, Records, Contracts, existing title policies, Facility Intellectual

Property and other documents of or relating to the Assets or the Facility. Seller and its Affiliates shall use their best efforts to furnish or cause to be furnished to Purchaser and its representatives all data and information concerning the Assets or the Facility that may reasonably be requested.

(b) <u>Maintenance</u>. Seller will carry on its customary programs of preventive maintenance with respect to the Assets diligently and in substantially the same manner as it previously was carried out. Seller will use its best efforts to preserve the value of the Assets, ordinary wear and tear excepted.

(c) <u>Notice of Change</u>. Seller will notify Purchaser promptly if Seller becomes aware of any trans-action or occurrence which would make any of Seller's representations and warranties in this Agreement untrue, as if such representations and warranties had been given as of the date on which Seller becomes aware of such transaction or occurrence; provided, however, that such notification shall only be required in each case if and only if Seller reasonably believes there is a reasonable possibility that such representation or warranty will not be true on and as of the Closing Date as if made on that date.

(d) <u>Contracts</u>. Neither Seller nor any of its Affiliates will enter into any Contract with respect to any of the Assets or the Facility which by its terms does not expire on or prior to the Closing Date or other-wise create any Lien with respect thereto and Seller shall cancel, effective as of the Closing, all Contracts set forth on the Disclosure Schedule that are not to be assumed by Purchaser.

(e) <u>No Sale or Negotiation for Sale Prior to Closing</u>. Neither Seller nor any of Seller's Affiliates or representatives shall at any time prior to the Closing remove from the Land, assign, transfer, convey, sell, hypothecate, or offer to sell, or otherwise negotiate for the assignment, transfer, sale, conveyance or hypothe-cation of any of the Assets or any interest therein, except to Purchaser or any of its Affiliates.

6.02 <u>Notification of Purchaser Breach</u>. Seller shall notify Purchaser promptly (but in all events prior to Closing) if Seller or its Affiliates discovers facts (i) constituting a misrepresentation or breach of warranty, covenant, agreement or obligation of or by Purchaser or Clarendon, Ltd. hereunder or (ii) which, if known to Purchaser, would constitute a misrepresentation or breach of warranty, covenant, agreement or obligation of or by Purchaser or Clarendon, Ltd.

6.03 <u>Agent for Service; Jurisdiction</u>. At or prior to Closing, Seller shall deliver to Purchaser documents, in form and substance satisfactory to Purchaser, whereby Seller and Martin Marietta Corporation each appoints CT Corporation System, 1633 Broadway, New York, New York 10019 as its agent for service of process and agrees to submission to jurisdiction as contemplated by Section 17.02 of this Agreement.

### ARTICLE SEVEN
### PURCHASER'S OBLIGATIONS BEFORE CLOSING

7.01 <u>Confidentiality</u>. Purchaser agrees that, unless and until the Closing has been consummated, Purchaser and its Affiliates and their officers, directors, and other representatives will not use in any manner or for any purpose any or all confidential data and information whether written or otherwise, obtained in connection with this transaction or Agreement, with respect to the business of Seller and if the transactions contemplated by this Agreement are not consummated, Purchaser will return to Seller all such data and information that Seller may reasonably request. Any such data and information will not be considered confidential hereunder if it is part of the public domain or becomes part of the public domain through no act or omission of Purchaser or if the disclosure thereof is required by subpoena or other court process or as may be required by law.

7.02 <u>Notification of Seller Breach</u>. Purchaser shall notify Seller promptly (but in all events prior to Closing) if Purchaser or its Affiliates discovers facts (i) constituting a misrepresentation or breach of warranty, covenant, agreement or obligation of or by Seller or Martin Marietta Corporation hereunder or (ii) which, if known to Seller, would constitute a misrepre- which,

sentation or breach of warranty, covenant, agreement or
obligation of or by Seller or Martin Marietta Corporation.

7.03 Agent for Service; Jurisdiction. At or
prior to Closing, Purchaser shall deliver to Seller
documents, in form and substance satisfactory to Seller,
whereby Purchaser and Clarendon, Ltd. each appoints
Curtis, Mallet-Prevost, Colt & Mosle, 101 Park Avenue, New
York, New York 10178, Attention: Roman A. Bninski, Esq.
as its agent for service of process and agrees to
submission to jurisdiction as contemplated by Section
17.02 of the Agreement.

7.04 U & W Matter. Purchaser agrees that at
Seller's request it will discuss with U & W Industrial
Supply Inc. the possibility of entering into a purchase
agreement for inventory, conditioned upon U & W's release
of all prior claims against Seller and its Affiliates, it
being understood that Purchaser is under no obligation to
enter into any such agreement.

ARTICLE EIGHT
CONDITIONS PRECEDENT

8.01 Conditions Precedent to Seller's
Performance. The obligations of Seller to sell and
transfer the Assets under this Agreement are subject to
the satisfaction, at or before Closing, of all the condi-
tions set forth in this Article Eight. Seller may waive
any or all of these conditions in whole or in part without
prior notice; provided, however, that no such waiver of a
condition shall constitute a waiver by Seller of any of
its other rights or remedies, at law or in equity, if
Purchaser shall be in default of any of its representa-
tions, warranties or covenants under this Agreement.

(a) Purchaser's Representations,
Warranties and Performance. All representations and
warranties by Purchaser contained in this Agreement or in
any written statement delivered by Purchaser under this
Agreement shall be true at and as of Closing as though
made at that time and Purchaser shall have performed and
complied with all covenants, agreements and obligations,
and satisfied all conditions that it is required by this
Agreement to perform, comply with or satisfy before or at
Closing, except for such misrepresentations and breaches

19

of representations, warranties, covenants, agreements and obligations which, in the aggregate, are not material.

(b) _Certificate of Purchaser_. Seller shall have received a certificate, dated as of the Closing, signed on behalf of Purchaser by Purchaser's president or a vice president certifying, in such detail as Seller and its counsel may reasonably request, that the conditions specified in Section 8.01(a) have been fulfilled.

(c) _Opinion of Purchaser's Counsel_. Purchaser shall have furnished Seller with an opinion, dated the Closing Date and addressed to Seller, of Curtis, Mallet-Prevost, Colt & Mosle, New York, New York, counsel for Purchaser and Clarendon, Ltd., in the form of Exhibit 8.01(c) hereto. In rendering their opinion, such counsel may rely, as to factual matters not otherwise within their actual knowledge upon certificates of officers or directors of Purchaser whose positions and authority would reasonably require them to have knowledge of the facts certified and of governmental officials and, to the extent matters covered by such opinion are governed by laws other than the law of New York or Federal law, upon the opinion of Winston A. Hodge, P.C. with respect to the laws of the USVI and upon the opinion of such other local counsel as counsel for Purchaser considers it reasonable to rely upon.

(d) _Absence of Litigation_. No action, suit or proceeding before any court or governmental body or authority or arbitration tribunal, pertaining to the transactions contemplated by this Agreement or their consummation, shall be threatened or shall have been instituted and be pending.

(e) _Governmental Consents_. All governmental consents and approvals required in connection with the transactions contemplated by this Agreement shall have been obtained.

(f) _Hart-Scott-Rodino_. The waiting period set forth in the H-S-R Act and the rules promulgated thereunder shall have expired or Seller shall have received notice of the early termination thereof.

(g)  _Jurisdiction_.  Purchaser and Clarendon, Ltd. shall have delivered to Seller the documents referred to in Section 7.03.

(h)  _Contract Assignment_.  Purchaser shall have delivered the Contract Assignment to Seller.

(i)  _Approval of Documents_.  The form and substance of all certificates, instruments, opinions and other documents delivered to Seller under this Agreement shall be in the form annexed hereto or satisfactory in all reasonable respects to Seller and its counsel.

8.02  _Conditions Precedent to Purchaser's Performance_.  The obligation of Purchaser to purchase the Assets under this Agreement is subject to the satisfaction, at or before Closing, of all the conditions set forth in this Section 8.02.  Purchaser may waive any or all of these conditions in whole or in part without prior notice; provided, however, that no such waiver of a condition shall constitute a waiver by Purchaser of any of its other rights or remedies, at law or in equity, if Seller shall be in default of any of its representations, warranties, or covenants under this Agreement.

(a)  _Clear Title_.  The Seller shall be the sole and exclusive owner of, and have good and marketable title to, all the Facility Equipment, Facility Intellectual Property, Inventory (if any) and Records, in each case free and clear of all Liens other than the Permitted Exceptions.

(b)  _Seller's Representations, Warranties and Performance_.  All representations and warranties by Seller in this Agreement or in any written statement that shall be delivered to Purchaser by Seller under this Agreement shall be true at and as of the Closing as though made at that time and Seller shall have performed and complied with all covenants, agreements and obligations and satisfied all conditions that it is required by this Agreement to perform, comply with, or satisfy before or at Closing, except for such misrepresentations and breaches of representations, warranties, covenants, agreements and obligations which, in the aggregate are not material.

21

(c)  No Material Changes.  During the period from the date hereof to Closing, there shall not have occurred any loss of, damage to or destruction of the Assets (other than as a result of actions of Purchaser or its agents), whether or not insured, which in the aggregate are, in Purchaser's reasonable discretion, material to the value or use intended by Purchaser of the Assets.

(d)  Certificate of Seller.  Purchaser shall have received a certificate, dated as of the Closing, addressed to Purchaser, signed on behalf of Seller by Seller's president or a vice president certifying, in such detail as Purchaser and its counsel may reasonably request, that the conditions specified in Sections 8.02(a) through 8.02(c) have been fulfilled.

(e)  Title Documents.  Purchaser shall have received the Deed with respect to the transfer of the Land and Improvements, the Bill of Sale, the FIP Assignment, the Contract Assignment and such other instruments of transfer and conveyance as will effect the assignment and delivery of the Assets and the Contracts assumed by Purchaser hereunder, free and clear of all Liens except Permitted Exceptions, all duly executed and acknowledged by Seller in form and substance satisfactory to Purchaser's counsel and in recordable form where and to the extent necessary.

(f)  Title Policy.  The Title Company shall have delivered to Purchaser at the Closing a commitment to issue the Title Policy required pursuant to Article Three or the Title Policy itself.

(g)  Good Standing Certificate.  Purchaser shall have received certificates of good standing of Seller, dated a recent date, in Delaware and the USVI.

(h)  Opinion of Seller's Counsel.  Seller shall have furnished Purchaser with an opinion dated the Closing Date and addressed to Purchaser, of Dewey, Ballantine, Bushby, Palmer & Wood, counsel for Seller and Martin Marietta Corporation, in the form of Exhibit 8.01(h).  In rendering their opinion, such counsel may rely, as to factual matters not otherwise within their actual knowledge, upon certificates of officers or directors of Seller or Martin Marietta Corporation whose

22

positions and authority would reasonably require them to have knowledge of the facts certified and of governmental officials and, to the extent matters covered by such opinion are governed by laws other than the laws of New York or Federal law, upon the opinion of Messrs. Dudley, Topper and Feuerzeig with respect to the laws of the USVI, upon the opinion of the General Counsel or an Associate General Counsel of Martin Marietta Corporation with respect to the laws of the State of Maryland and upon the opinion of such other local counsel as counsel for Seller considers it reasonable to rely upon.

(i)  <u>Records</u>.  The Purchaser shall have received all Records.

(j)  <u>Absence of Litigation</u>.  No action, suit, or proceeding before any court or governmental body or authority or arbitration tribunal, pertaining to the transactions contemplated by this Agreement or to their consummation, shall be threatened or shall have been instituted and be pending.

(k)  <u>Corporate Approval</u>.  The execution and delivery of this Agreement by Seller, and the performance of its covenants and obligations under it, shall have been duly authorized by all necessary corporate action.

(l)  <u>Governmental Consents</u>.  All governmental consents and approvals required in connection with the transactions contemplated by this Agreement shall have been obtained.

(m)  <u>Assignment of Facility Permits</u>.  Purchaser shall have received an irrevocable assignment from Seller of all Facility Permits which are assignable and shall have received such consents (or shall have received reasonable assurances that such consents will be received within a reasonable time after Closing) for the transfer from Seller to Purchaser of all such Facility Permits as Purchaser in its reasonable discretion determines are required in connection therewith.

(n)  <u>Permits</u>.  Purchaser shall have obtained, or shall have received reasonable assurances that it shall be issued within a reasonable time after Closing all Permits (whether transferrable or non-transferrable) which, in Purchaser's reasonable discretion, are

23

required to conduct the operation of the Facility as proposed to be conducted by Purchaser.

(o) <u>Release of Claims</u>. Purchaser shall have received evidence reasonably satisfactory to Purchaser and its counsel of the release or termination of all Contracts to which Seller or any of its Affiliates is a party with respect to any of the Assets or to which any of the Assets are bound or subject.

(p) <u>Hart-Scott-Rodino</u>. The waiting period set forth in the H-S-R Act and the rules promulgated thereunder shall have expired or Purchaser shall have received notice of the early termination thereof.

(q) <u>Bulk Sales Compliance</u>. Seller and Purchaser shall have delivered such documents and performed such acts required for the sale of the Assets hereunder to comply with the provisions of the Uniform Commercial Code as in effect in the USVI relating to bulk sales or Seller shall have agreed to indemnify Purchaser concerning non-compliance with such provisions.

(r) <u>Environmental Audit</u>. An environmental audit of the Land, Improvements, Facility Equipment, Inventory and surrounding environment shall have been conducted by Geraghty & Miller on Purchaser's behalf and at Purchaser's expense and a report of the results thereof (the "Environmental Report") delivered by it to Purchaser and Seller and the results thereof shall be satisfactory to Purchaser in its sole discretion.

(s) <u>Asbestos Disposal</u>. Prior to the Closing Date Seller shall remove from the Land, and dispose of in accordance with Legal Requirements, all asbestos waste material which has been accumulated specifically for disposal by or on behalf of Seller and its Affiliates.

(t) <u>Purchaser's Certificate and Tax Exemptions</u>. Purchaser shall have been granted by the government of the USVI a certificate from the USVI Industrial Development Commission under the Industrial Development Program of the USVI, in form and substance satisfactory to Purchaser in its reasonable discretion, relating to Purchaser's purchase from Seller and operation of the Assets, pursuant to which Purchaser shall have been granted

24

substantially all tax benefits such commission is author-
ized by law to grant.

(u) Other Documents. The Purchaser shall
have received any other certificates or documents as may
be reasonably requested by Purchaser or its counsel.

(v) Jurisdiction. Seller and Martin
Marietta Corporation shall have delivered to Purchaser the
documents referred to in Section 6.03.

(w) Approval of Documents. The form and
substance of all certificates, instruments, opinions and
other documents delivered to Purchaser under this Agree-
ment shall be in the form annexed hereto or satisfactory
in all reasonable respects to Purchaser and its counsel.

(y) Withholding Certificate. Seller shall
have provided Purchaser with a "withholding certificate,"
as such term is defined in the regulations promulgated
pursuant to Section 1445 of the U.S. Internal Revenue Code
of 1986, as amended, as applicable to the USVI, indicating
that no withholding from the Purchase Price is required,
together with a certificate of an officer of Seller to the
effect that to the best of his knowledge such withholding
certificate is valid and in full force and effect on the
Closing Date.

8.03 Casualty. If, prior to Closing, a portion
of the Assets shall be damaged, destroyed or stolen (other
than by action of Purchaser or its agents), whether or not
insured, and Purchaser determines in its reasonable
discretion that as a result thereof the Facility Assets
cannot be used as intended by Purchaser, then in such
event, Purchaser may terminate this Agreement by written
notice and such termination shall be without liability to
either party. If, prior to the Closing, a portion of the
Assets shall be damaged, destroyed or stolen, but
Purchaser nonetheless elects to proceed with the Closing,
the Purchase Price shall be reduced by an amount equal to
the estimated total cost (after giving effect to insurance
proceeds) necessary to repair or replace such damage,
destruction or loss. The adjustments in accordance with
this Section are the exclusive adjustments to be made by
reason of such occurrence for the purposes of this
Agreement.

8.04 <u>Condemnation</u>.  If, prior to Closing, there shall occur a taking by condemnation (whether permanently or for a term of years, and whether or not insured or otherwise subject to compensation) of any part or all of the Assets or any or all of the rights appurtenant to any of the Assets which in Purchaser's reasonable opinion materially and adversely interferes with the proposed use of the Facility (including, but not limited to, any taking of the port facilities, power facilities or desalinization facilities) or if on or prior to the Closing Date any proceedings for any such condemnation are commenced or threatened, then Purchaser may terminate its obligations under this Agreement by notice given to Seller prior to the Closing.  If Purchaser does not so elect to terminate its obligations under this Agreement, then the Closing shall take place as herein provided, and Seller shall assign and transfer to Purchaser at the Closing, by written instrument (satisfactory in form and substance to Purchaser and its counsel), all of Seller's interest in any condemnation award which may be payable to the Seller on account of any such condemnation attributable to any of the Assets.

ARTICLE NINE
<u>THE CLOSING</u>

9.01  <u>Time of Closing</u>.  The Closing hereunder (the "Closing") shall take place at the offices of Curtis, Mallet-Prevost, Colt & Mosle, New York, New York, on May 15, 1989 at 10:00 a.m., or at such other date, time and place as may be acceptable to the parties.

9.02  <u>Seller's Obligations</u>.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser all documents, deeds, assignments, bills of sale, certificates, letters, agreements and other items required by Section 8.02 hereof which have not already been delivered prior to Closing.

9.03  <u>Purchaser's Obligation</u>.  At the Closing Purchaser shall deliver or cause to be delivered to Seller the Purchase Price, as adjusted pursuant to Section 8.03 and/or Section 9.04, and all documents, assignments, certificates and other items required by Section 8.01 hereof which have not already been delivered prior to Closing.

26

9.04 <u>Closing Adjustments and Prorations</u>. Prorations to the Purchase Price shall be made between Seller and Purchaser as of 11:59 p.m. of the day preceding the Closing Date with respect to each of the following:

(a)  any accrued real property taxes not yet due and payable including real property taxes for the then current tax fiscal year and any installment of real property taxes due and payable for any prior tax fiscal year, shall be prorated as of the Closing Date based upon the January 1989 assessment of the Assets. If the Closing occurs prior to the receipt by the Seller of the tax bill resulting from the January 1989 assessment, Purchaser and Seller shall prorate real property taxes based upon the January 1988 assessment. Thereafter, upon receipt of the tax bill or bills based upon the January 1989 assessment, the proration of taxes shall be recalculated based upon such assessment, and Purchaser or Seller, as the case may be, shall pay to the other on demand the amount that may be necessary to effectuate the adjustment;

(b)  all personal property taxes, and water and sewer rents, rates and charges shall be prorated as of the Closing Date.  If the amount of any such item is unascertainable on the Closing Date, the credit therefor shall be based on the most recent available bill;

(c)  utilities (including, without limitation, contracts for the supply of heat, steam, electric power, gas, lighting, telephone and telex contracts), payable by Seller, based upon the last reading of meters, prior to the Closing, which readings Seller shall endeavor to obtain not more than two days prior to the Closing, shall be prorated.  Purchaser shall place with the utility companies such deposits as are necessary in order that Seller may obtain a refund of its deposits, and all utility deposits shall be refunded to Seller.  Seller shall endeavor to obtain meter readings on the Closing Date, and if such readings are obtained, there shall be no proration of such items and Seller shall pay the bills therefor for the period to the Closing Date, and Purchaser shall pay the bills therefor for the period subsequent to the Closing Date as and when rendered; and

(d)  license and permit fees, if any, with respect to Facility Permits assigned to Purchaser at the Closing shall be prorated as of the Closing Date.

If, on the Closing Date, the Land and Improvements or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in annual installments, all the unpaid installments of any such assessment due prior to the Closing Date shall be paid by Seller without increase of the Purchase Price, and all installments due after the Closing Date shall be paid by Purchaser (subject to proration as provided herein).

9.05  Conveyance and Sales Taxes.  All conveyance taxes, transfer taxes, sales taxes and other excise taxes imposed or which may become due in connection with the sale, transfer or assignment of the Assets hereunder shall be borne and paid by Seller; provided, however, that Purchaser and Seller shall each bear and pay one-half of the 2% USVI conveyancing tax set forth in Title 33, § 121, of the USVI Code, as amended November 7, 1983.

9.06  Termination.  The parties will use their best efforts to close as soon as practical.  If the Closing shall not have occurred on or before May 15, 1989, either party shall have the right to terminate this Agreement upon notice to the other party and, upon such notice, this Agreement shall terminate and be of no further force and effect except for any remedies Purchaser may have for any breach by Seller of Section 6.01(e) hereof prior to May 15, 1989 and to any remedies Seller may have for any breach by Purchaser of Section 7.01 hereof. Time is of the essence with respect to the Closing Date.

ARTICLE TEN
ENVIRONMENTAL MATTERS

10.01  Definition of Pre-Closing Environmental Conditions.  For the purposes of this Article Ten, the term "Pre-Closing Environmental Conditions" shall mean conditions existing at or before the Closing, pertaining to surface or subsurface conditions, soil or the groundwater with respect to the Land, to the extent, and

28

only to the extent, that such conditions, pursuant to Legal Requirements as in effect on the Closing Date and applicable to the Assets and the Facility in its shut-down condition:

(i) require (with or without notice or a Judgment with respect thereto) remedial investigation and/or action and/or suits, actions or other proceedings for remedial action, study or investigation and/or

(ii) give rise to Judgments, claims, demands, penalties, costs, and/or other liability of any nature of the Purchaser and/or any of Purchaser's Affiliates.

Pre-Closing Environmental Conditions shall not encompass any conditions to which the matters specified in clause (i) or (ii) above would otherwise apply, if remediation thereof would not have been required but for (a) a change in applicable Legal Requirements after the Closing or (b) if such remediation is required for a condition created (including a condition compounded by Purchaser, but only to the extent so compounded) after Closing, or (c) a condition resulting from Purchaser's or its Affiliates' activities at the Facility or on the Land pursuant to the Agreement dated as of January 1, 1989 between Seller and Clarendon, Ltd.

10.02 Indemnification for Pre-Closing Environmental Conditions. With respect to Pre-Closing Environmental Conditions, the parties shall have the following responsibilities:  (a) Purchaser shall be responsible for, and shall indemnify, save and hold Seller and its Affiliates harmless against, the first $1,000,000 arising therefrom (determined in the aggregate), (b) Seller shall be responsible for, and shall indemnify, save and hold Purchaser and its Affiliates harmless against, the next $1,000,000 arising therefrom (determined in the aggregate), (c) each of Purchaser and Seller agrees to be responsible for, and each shall indemnify, save and hold the other and their respective Affiliates harmless against, 50% of the amount arising therefrom suffered or incurred in an aggregate amount exceeding $2,000,000 but less than $70,000,000 and (d) Purchaser shall be responsible for, and shall indemnify, save and hold Seller and its Affiliates harmless against the amount arising there-

29

from which is not otherwise the responsibility of Seller hereunder (including in respect of Pre-Closing Environmental Conditions of which Purchaser has not given notice to Seller within the four-year period as provided in the following sentence).

Notwithstanding the foregoing, Seller shall only be responsible for and required to indemnify, save and hold Purchaser and its Affiliates harmless with respect to such Pre-Closing Environmental Conditions if and to the extent that, on or prior to the fourth anniversary of the Closing Date Purchaser shall have given Seller notice that (i) compliance with Legal Requirements with respect to the matters covered by this Article Ten requires remedial investigation and/or action with respect thereto (whether or not such action has to be taken on or before the fourth anniversary of the Closing Date and whether or not any monies have actually been expended as of such date), (ii) a suit, action or other proceeding for remedial action, study or investigation with respect to a Pre-Closing Environmental Condition has been brought or filed or otherwise commenced or (iii) a suit, action or other proceeding has been brought or filed or otherwise commenced against Purchaser and/or any of its Affiliates which if successful could result in judgments, claims, demands, penalties, costs and/or other liability of any nature of the Purchaser and/or any of its Affiliates with respect to a Pre-Closing Environmental Condition.

In consideration of the respective indemnities given under this Article Ten, the parties hereby waive any and all applicable statutory rights of contribution with respect to each other regarding environmental conditions at the Facility under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or under any other similar federal or state statute.

The extent of Seller's liability to Purchaser under this Article Ten for the events described in the last two sentences of Section 10.04(a) shall be limited as provided therein. In addition, no provision of this Agreement shall impose on or subject Seller or any of its Affiliates to any greater obligation concerning remediation of conditions at the Facility than any of them would have with respect thereto if such conditions were known at the time of Closing.

30

10.03 <u>Additional Indemnification</u>.  Purchaser
shall be responsible for, and shall indemnify, save and
hold Seller and its Affiliates harmless with respect to
(i) all environmental conditions at the Facility from and
after the Closing which are not Pre-Closing Environmental
Conditions, (ii) the removal or encasing of asbestos in or
on Equipment or enclosed within any of the Improvements
other than asbestos waste material accumulated
specifically for disposal by or on behalf of Seller and
its Affiliates prior to the Closing Date and (iii) Poly-
chlorinated Biphenyls ("PCBs") in service (within the
meaning of 40 C.F.R. § 761.180) located within transformers
constituting Improvements or Facility Equipment (the "PCB
Transformers") to the extent said PCB's are located at the
Facility.

10.04 <u>Procedure and Implementation</u>

(a)  Seller and Purchaser shall cooperate
with each other regarding any action called for or taken
with respect to Pre-Closing Environmental Conditions
(including, but not limited to, any investigation of
and/or the initiation and/or implementation of any remedi-
ation with respect thereto) so that such actions are
carried out in the most efficient cost effective manner
which will not impede operations; provided, that if any
such action or the continuation thereof would in
Purchaser's reasonable opinion materially or unreasonably
interfere with the operation of the Facility no such
action shall be taken without the prior approval of
Purchaser.  Should Purchaser wish to undertake any
remedial action with respect to a claimed Pre-Closing
Environmental Condition before the issuance of a final
order or Judgment in respect thereto, Purchaser shall seek
Seller's consent to such action, which shall not be
withheld unreasonably.  If Seller denies the existence of
a Pre-Closing Environmental Condition or refuses its
consent with respect to the remediation thereof, Purchaser
may undertake such action.  In such event, Seller's
liability to Purchaser under this Article Ten with respect
to such condition shall require a final order or Judgment
or agreement that such condition is a Pre-Closing
Environmental Condition and the amount of such liability
with respect to such condition shall be limited to amounts
reasonably necessary to remedy such condition.

(b)  Each party agrees to notify the other party within 10 days of any demand for action with respect to a Pre-Closing Environmental Condition made of that party.  With respect to any such demand Purchaser and Seller shall participate and cooperate in any remedial investigation or action (including the construction and design of remedial facilities) and in the defense of (including providing witnesses for use with respect to) any action and/or any suit or other proceeding with respect thereto, including settlement discussions, with counsel chosen by Purchaser and reasonably acceptable to Seller.  Purchaser shall have final control over what shall be done with respect to any and all suits, actions or other proceedings for remedial action, study or other proceedings for remedial action, study or other proceedings in connection investigation and settlement discussions in connection therewith, but Seller shall have the right to be represented by separate counsel at Seller's expense in connection with any such demand, suits, actions or other proceedings.  Subject to applicable legal and contractual limitations, each party shall make available the knowledge and expertise of such party and its Affiliates, including proprietary information developed in connection with its and its Affiliates' other facilities, in resolving or mitigating any Pre-Closing Environmental Conditions.  In addition, Seller and its Affiliates shall use their best efforts to pursue all remedies under its insurance policies with respect to Pre-Closing Environmental Conditions.

(c)  If either party or its Affiliates pursues any remedies against any third party (whether pursuant to insurance coverage or otherwise) with respect to any Pre-Closing Environmental Conditions, the net recovery therefrom (after payment of attorneys fees and expenses and other fees and expenses with respect thereto) shall be utilized to pay (or reimburse the parties for payment of) the amounts expended with respect to such Pre-Closing Environmental Condition.  Each party agrees that it and its Affiliates shall cooperate with the other party in connection with any such claim against any third party, including but not limited to providing documents and witnesses (but such cooperation shall not include a requirement to litigate in its own name or, unless required by applicable law for pursuit of the claim, to permit the other party to litigate in its name).

(d)  Each party and its agents and other representatives shall be entitled, subject to the other party's right to preserve attorney-client and attorney work product privilege to the extent available under applicable law, upon reasonable notice to reasonable access during business hours to documents, test and laboratory data, insurance reports, consultant reports and files containing correspondence with regulatory agencies in the possession of such other party and its Affiliates and to other information and personnel of such other party or any of its Affiliates having information with respect to environmental conditions on the Land and/or at the Facility.  In addition, Purchaser shall give Seller access to the Land and Facility, at reasonable times and without disruption to Purchaser's business, to enable Seller to inspect and/or conduct testing and sampling with respect to environmental conditions or any alleged Pre-Closing Environmental Condition and to determine the scope of clean-up or remedial work as may be necessary.  Seller shall indemnify, defend and hold Purchaser harmless from and against any loss, damage, liability or claims resulting from Seller's and its Affiliates' activities on the Land after Closing, whether such activities are conducted by Seller or its Affiliates, or at the request of any of them by Purchaser's or its Affiliates' employees, or by any of Seller's or Seller's Affiliates' consultants, contractors or other representatives, or by any of their employees or agents of any description, subject to the Virgin Islands Comparative Damages Statute, Title 5, § 1451 of the USVI Code.

## ARTICLE ELEVEN
### INDEMNIFICATION

11.01 General.  From and after the Closing, Seller shall indemnify Purchaser and its successors and assigns and Purchaser shall indemnify Seller and its successors and assigns (other than for environmental matters covered by Article Ten) as provided in this Article Eleven.  For the purposes of this Article Eleven, each party shall be deemed to have remade all of its representations and warranties contained in this Agreement on the Closing Date with the same effect as if originally made at such time.

33

11.02 <u>Seller's Indemnification Covenants</u>.  Seller shall indemnify, save and hold Purchaser, and its successors and assigns, forever harmless against and from any and all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs, damages and expenses, including, without limitation, reasonable legal, accounting, engineering, consulting and other fees and expenses, which may be imposed on, sustained by, incurred by or asserted against Purchaser or any of its successors or assigns by any other person or entity (including, without limitation, any federal, USVI, state or local governmental entity, third party and/or former or present employee) as a result of or arising out of or in connection with:

(a)  any untrue representation or warranty made by Seller to Purchaser herein or in any exhibit, schedule or certificate delivered to Purchaser as provided herein (determined as if materiality standards, if any, set forth therein were not so included);

(b)  the failure of Seller to comply with, or the breach by Seller of, any of the covenants contained in this Agreement (including, without limitation, this Article Eleven) or in any exhibit, schedule or certificate delivered to Purchaser as provided herein (determined as if materiality standards, if any, set forth therein were not so included);

(c)  the failure of Seller to discharge when due any obligation (other than in connection with environmental matters with respect to the Land and the Facility) of Seller or any of its Affiliates not assumed hereunder by Purchaser, or any claim against Purchaser with respect to any such obligation or alleged obligation, including, without limitation, liability to trade creditors and liability on account of taxes payable by Seller or any of its Affiliates or for which Seller or any of its Affiliates is liable, either by operation of law or pursuant to the provisions of this Agreement;

34

(d)   product liability claims to the extent caused by acts or omissions of Seller or its Affiliates prior to Closing; or

(e)   any act or omission (other than in connection with environmental matters with respect to the Land and the Facility or in connection with the physical condition of the Assets or the Facility at or after Closing) of Seller or its Affiliates with respect to the Assets occuring prior to the Closing; provided that this indemnity obligation is not intended to cover matters for which Clarendon, Ltd. is responsible under the Agreement dated as of January 1, 1989 between Seller and Clarendon, Ltd.

11.03 Purchaser's Indemnification Covenants. Purchaser shall indemnify, save and hold Seller, its successors and assigns, forever harmless against and from any and all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs, damages and expenses, including, without limitation, reasonable legal, accounting, engineering, consulting and other fees and expenses, which may be imposed on, sustained by, incurred by or asserted against Seller or any of its successors and assigns by any other person or entity (including, without limitation, any federal, USVI, state or local governmental entity and/or third party as a result of or arising out of or in connection with:

(a)   any untrue representation or warranty made by Purchaser to Seller herein or in any exhibit, schedule, certificate or other document delivered to Seller as provided herein;

(b)   the failure of Purchaser to comply with, or the breach by Purchaser of, any of the covenants contained in this Agreement (including without limitation this Article Eleven) or in any exhibit, schedule, certificate or other document delivered to Seller as provided herein;

(c) Purchaser's failure to honor, discharge, pay or fulfill any responsibility, liability or obligation (other than in connection with environmental matters with respect to the Land and the Facility) assumed by Purchaser pursuant to this Agreement or any agreement delivered by Purchaser as provided herein;

(d) product liability claims to the extent caused by acts or omissions of Purchaser or its Affiliates after to Closing;

(e) any act or omission with respect to the Assets (other than in connection with environmental matters with respect to the Land and the Facility) of Purchaser or its Affiliates occurring after Closing; or

(f) the physical condition of the Assets or the Facility at or after Closing (other than as covered by Article 10) whether or not such condition was caused by any act or omission occurring prior to Closing.

11.04   Subrogation.  The party required to indemnify under this Article Eleven (the "Indemnifying Party") shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the party entitled to indemnification under this Article Eleven (the "Indemnified Party") and shall not be subrogated to any right of action until it has paid in full or successfully defended against the claim for which indemnification is sought.

11.05.   Procedure for Third Party Claims.

(a) If a party shall receive notice of the assertion by a person (including, without limitation, any governmental entity) other than the other party to this Agreement of any claim or of the commencement by any such person of any action (a "Third Party Claim") with respect to which the Indemnifying Party may be obligated to

36

provide indemnification pursuant to this Agreement (other than indemnification pursuant to Article Ten hereof), the party receiving such notice shall notify the other party of its existence within ten (10) days after receipt thereof, enclosing therewith a copy of the notice so received by the Indemnified Party.

(b)   The Indemnifying Party may elect, by giving notice to the Indemnified Party within twenty (20) days after receipt of notice from the Indemnified Party of such Third Party Claim, to assume the defense of such claim, subject to Section 11.06 of this Agreement.  If an Indemnifying Party so chooses to defend or to seek to compromise or settle any Third Party Claim, the Indemnified Party shall make available to such Indemnifying Party (at the cost of the Indemnifying Party and during such business hours and in such manner as does not unreasonably interfere with the business operations of the Indemnified Party), any personnel or any books, records or other documents within its control or which it otherwise has the ability to make available that are reasonably necessary or appropriate for such defense, settlement or compromise, and shall otherwise cooperate in the defense, settlement or compromise of such Third Party Claim.  If any such compromise or settlement involves the release or modification of any claim or right of the Indemnified Party or requires any action of or places any burden upon the Indemnified Party, such compromise or settlement shall be subject to the prior written approval of the Indemnified Party, which shall not be unreasonably withheld or delayed.

In the event that the Indemnifying Party does not notify the Indemnified Party of its election to defend within said twenty (20) days, the Indemnified Party will have the right (upon notice to the Indemnifying Party) to undertake the defense, compromise or settlement of such Third Party Claim, provided (i) that any such compromise or settlement shall be subject to Section 11.06 of this Agreement; (ii) the Indemnifying Party shall make available to the Indemnified Party personnel and books, records and other documents in the same manner as set forth hereinabove; (iii) the Indemnified Party shall not enter into any such compromise or settlement without the Indemnifying Party's consent if the Indemnifying Party has confirmed its obligation to indemnify the Indemnified Party in respect of the Third Party Claim, and (iv) the

37

Indemnifying Party shall be required to indemnify the Indemnified Party if the former unreasonably withholds consent to any such compromise or settlement and has failed to confirm its obligation to indemnify the Indemnified Party.

(c)  If the Indemnifying Party undertakes the defense of any such Third Party Claim pursuant to subsection (b) above, the Indemnified Party shall have the right to participate in the defense, compromise or settlement of such Third Party Claim; _provided_, that the Indemnifying Party shall not be liable for expenses of separate counsel, experts or other agents of the Indemnified Party engaged for such purpose.  If said right is exercised, the Indemnified Party and Indemnifying Party shall cooperate fully in the defense, compromise or settlement thereof.

11.06  _De Minimis_.  Anything in this Agreement to the contrary notwithstanding, no indemnification payment shall be made to Purchaser pursuant to this Agreement (other than pursuant to Article Ten hereof) until the amounts which Purchaser would otherwise be entitled to receive as indemnification under this Agreement (other than pursuant to Article Ten hereof or in connection with non-compliance with the USVI bulk sales law or any Taxes) ("Indemnifiable Losses") aggregate at least $500,000 (U.S.) (the "Trigger Amount").  Thereafter Purchaser shall be entitled to receive indemnification payments from Seller pursuant to this Agreement for Indemnifiable Losses, in excess of the Trigger Amount up to a maximum indemnification of $5,000,000 (U.S.).  Seller shall not be entitled to undertake the defense of any new Third Party Claim pursuant to Section 11.05(b) (i) until Indemnifiable Losses and currently outstanding claims therefor exceed the Trigger Amount or (ii) after Indemnifiable Losses and currently outstanding claims therefor equal or exceed $5,500,000 (U.S.).

## ARTICLE TWELVE
## POST-CLOSING MATTERS

12.01  _Further Documents or Actions_.  Seller, at any time before or after the Closing, will execute, acknowledge and deliver any further deeds, assignments or conveyances, and any other assurances, documents, and instruments of transfer, reasonably requested by Purchaser

and will take any other action consistent with the terms of this Agreement that may reasonably be requested by Purchaser for the purpose of assigning, transferring, granting, conveying and confirming to Purchaser, or reducing to possession, any or all property to be conveyed and transferred by this Agreement.

12.02 <u>Employees</u>. Seller has heretofore furnished Purchaser with a list of the names and job descriptions of each Facility Employee employed by Seller as of the date of such list. As soon as practicable after the execution and delivery of this Agreement, but in any event within fifteen days thereof, Purchaser shall advise Seller as to which of such employees Purchaser will employ on and after the Closing. Except with respect to the employees so named by Purchaser. Purchaser shall have no obligation to employ any of the Facility Employees after Closing.

12.03 <u>Access to Records</u>.

(a) Until five years after the Closing Date (and, if at the expiration thereof Purchaser is notified by Seller that any applicable statute of limitations has been extended, until such statute of limitations expires or until ten years after the Closing Date, whichever first occurs) Purchaser will, with respect to tax and other financial matters relating to the period prior to the Closing Date retain and, as Seller or Martin Marietta Corporation may reasonably request, permit such other party to inspect and copy at such other party's expense, the Records in possession of Purchaser; provided, that Purchaser, at Seller's request and expense, will make copies of such Records as Seller may reasonably request and forward the same to Seller. Purchaser shall, before destroying any Records, notify Seller and permit Seller at its own expense to remove and retain such Records; provided, however, that Purchaser shall not be liable for any inadvertent disposal of such Records.

(b) Until five years after the Closing Date (and, if at the expiration thereof, Seller is notified by Purchaser that any applicable statute of limitations has been extended, until such statute of limitations expires or until ten years after the Closing Date, whichever first occurs) Seller will retain and, as Purchaser or Clarendon, Ltd. may reasonably request, permit such other party to inspect and copy at such other party's expense, books and records in Seller's or Martin Marietta Corporation's possession on the Closing Date relating to the

39

Assets and the operation thereof; provided, that Seller, at Purchaser's request and expense, will make copies of any of such books and records as Purchaser may reasonably request and forward the same to Purchaser. Seller and Martin Marietta Corporation shall, before destroying any of such books and records, notify Purchaser and permit Purchaser at its own expense to remove and retain such books and records; provided, however, that Seller and Martin Marietta Corporation shall not be liable for any inadvertent disposal of such books and records.

12.04 Production of Witnesses. From and after the Closing, each of the Purchaser and Seller shall use reasonable efforts (after due consideration of the minimization of business disruption in connection therewith) to make available to the other upon written request at the other's expense, its and its Affiliates' officers, directors, employees and agents as witnesses to the extent that such persons may reasonably be required in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved.

12.05 Storage. For a period of five years following the Closing, Seller shall have the right without charge to store on the Land, and have reasonable access at reasonable times and without disruption to Purchaser's business to, the structures, fixtures and improvements constructed by CFC constituting that certain ethanol refinery located on the Land. At any time or from time to time during this period Seller shall have the right, at its sole expense, to remove all or any part thereof from the Land or to transfer the same to Purchaser at no cost to Purchaser. Purchaser will cooperate with Seller in effecting any such removal without charge to Seller.

## ARTICLE THIRTEEN
## PUBLICITY

13.01 Publicity. All notices to third parties and all other publicity concerning the transactions contemplated by this Agreement shall be jointly planned and coordinated by and between the parties. Neither of the parties shall cause or authorize any such notice or publicity without the prior approval of the other party; provided, however, that in the case of an announcement which a party may be required by law or by any governmen-

tal agency or by the New York Stock Exchange or similar exchange to make, issue or release (in each case as reasonably determined by such party), such action by such party without the prior approval by the other party shall not constitute a breach of this section if such party gives the other party prompt written notice of such action.

## ARTICLE FOURTEEN
### BROKERS AND EXPENSES

14.01  Broker.  The parties hereto represent and warrant that there are no brokers or finders known to them to be involved with this transaction.

14.02  Expenses.  Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiation and preparation of this Agreement and in Closing and carrying out the transactions contemplated by this Agreement.

## ARTICLE FIFTEEN
### FORM OF AGREEMENT

15.01  Headings.  The subject headings of the sections, paragraphs and subparagraphs of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

15.02  Modification and Waiver.  This Agreement, the related guarantees delivered herewith and the Agreement between Seller and Clarendon, Ltd. dated as of January 1, 1989 together constitute the entire agreement between the parties and their Affiliates pertaining to its subject matter and supersede all prior and contemporaneous agreements, representations, and understandings of the parties and their Affiliates with respect thereto.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by Purchaser and Seller.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver

41

shall be binding unless executed in writing by the party making the waiver.

15.03 <u>Counterparts</u>. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

ARTICLE SIXTEEN
<u>PARTIES</u>

16.01 <u>Rights of Parties</u>. Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

16.02 <u>Assignment</u>. This Agreement shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors and assigns; provided, however, that neither party hereto may assign its obligations under this Agreement by operation of law or otherwise, without the prior written consent of the other, except that consent shall not be required for Purchaser to make such assignment to one of its Affiliates where such assignment does not relieve Purchaser of liability hereunder. Notwithstanding the foregoing, upon any sale or transfer of the Facility, or any transfer or sale of control of the entity which owns the Facility, to a party which is not an Affiliate of the Purchaser, Seller's obligations (but not its rights) under this Agreement shall terminate; for the purposes of this sentence, the right to elect a majority of the board of directors or other governing body of the entity owning the Facility shall constitute "control" thereof.

ARTICLE SEVENTEEN
REMEDIES

17.01 Governing Law. Solely for the purpose of determining governing law and jurisdiction, the parties acknowledge and agree that this Agreement constitutes a contract pertaining to a transaction covering in the aggregate not less that $1,000,000. This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of New York.

17.02 Submission to Jurisdiction. By the execu-tion of this Agreement and the related guarantees delivered herewith, Seller, Purchaser, Martin Marietta Corporation and Clarendon, Ltd. hereby agree that any legal action or proceeding arising out of or relating to this Agreement may be instituted in any State or Federal court in the Borough of Manhattan, State of New York, the United States of America and, in connection therewith, such entities waive to the extent permitted by law any rights each may have to a trial by jury in any such court and each hereby irrevocably submits to the jurisdiction of any such court in any such suit or proceeding.

ARTICLE EIGHTEEN
NATURE AND SURVIVAL OF REPRESENTATIONS AND OBLIGATIONS

18.01 Effect of Certain Actions. No action taken pursuant to or related to this Agreement, including without limitation any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any represen-tation, warranty, condition or agreement contained herein.

18.02 Survival. All representations, warran-ties, covenants, and agreements of the parties contained in this Agreement, or in any instrument, certificate, opinion, or other writing provided for in it, shall survive Closing for a period of two years (the "Survival Period"), except for the provisions of Articles 10, 14 and 17 and (with respect to claims made within the Survival Period) Article 11, each of which shall survive Closing without any limitation period except as provided therein.

43

ARTICLE NINETEEN
NOTICES

19.01  Notices.  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given; or on the third day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage pre-paid, at the address set forth below;  on the date of delivery to an overnight courier service, delivery charges prepaid, at the address set forth below; or on the date of service if delivered by facsimile to the facsimile number set forth below which facsimile is confirmed within three days by deposit of a copy of such notice in first class mail, registered or certified, postage prepaid at the address set forth below.  Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

If to Purchaser:

Virgin Islands Alumina, Inc.
c/o Clarendon, Ltd.
100 First Stamford Place
Stamford, Connecticut 06902
Attention: Mr. In-Suk Oh
           Mr. Simon Trinca

with a copy to:

Curtis, Mallet-Prevost, Colt & Mosle
101 Park Avenue
New York, New York 10178-0061
Attention: Roman A. Bninski, Esq.
Fax No.: (212) 697-1559

If to Seller:

Martin Marietta Aluminum Properties, Inc.
Attention: President
c/o Martin Marietta Corporation
6801 Rockledge Drive
Bethesda, Maryland  28017
Fax No.: 301-897-6800

44

with a copy to:

Martin Marietta Corporation
Attention:  Vice President and General Counsel
6801 Rockledge Drive
Bethesda, Maryland  28017
Fax No.:    301 897-6800

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it on the day and year first above written.

MARTIN MARIETTA ALUMINUM PROPERTIES, INC.

By: _____
      Title

VIRGIN ISLANDS ALUMINA, INC.

By: _____
      Title

45

EXHIBIT 1.25

Real Property Description

St. Croix, U.S. Virgin Islands

1. Parcel No. 12 of V.I. Corp. Lands, King's Quarter, St. Croix, U.S. Virgin Islands, containing 90.607 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 1625 KB filed with the Department of Public Works for the Government of the U.S. Virgin Islands ("D.P.W.") and Document No. 3937/1976 and Document No. 1538/1977, both filed with the Recorder of Deeds for the District of St. Croix (the "Recorder").)

2. Parcel No. 12-A of V.I. Corp. Lands, King's Quarter, St. Croix, U.S. Virgin Islands, containing 36.37 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 1625 KB filed with D.P.W. and Document No. 3937/1976 and Document No. 1538/1977, both filed with the Recorder)

3. Parcel No. 12-D of V.I. Corp. Lands, King's Quarter, St. Croix, U.S. Virgin Islands, containing 1.419 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 1625 KB filed with D.P.W. and Document No. 3937/1976 and Document No. 1538/1977, both filed with the Recorder.)

4. Parcel No. 12-E of V.I. Corp. Lands, King's Quarter, St. Croix, U.S. Virgin Islands, containing 0.414 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 1625 KB filed with D.P.W. and Document No. 3937/1976 and Document No. 1538/1977, both filed with the Recorder.)

5. Plot No. 138 Estates Profit and Annaberg, King's Quarter, St. Croix, U.S. Virgin Islands, containing 3.921 U.S. acres more or less, as shown on P.W.D. Drawing No. ____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 2011 filed with D.P.W. and Document No. 2748/1967 filed wit the Recorder.)

6. Plot No. 139 Estates Profit and Annaberg, King's Quarter, St. Croix, U.S. Virgin Islands, containing 4.142 U.S. acres more or less, as shown on P.W.D. Drawing No. ____, dated _____, 1989 (For metes and bounds, see P.W.D. No. 2011 filed with D.P.W. and Document No. 2749/1967 filed with the Recorder.)

7. Plot No. 148 Estate Profit, King's Quarter, St. Croix, U.S. Virgin Islands, containing .71 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 3054 filed with D.P.W. and Document No. 2682/1972 filed with the Recorder.)

8. Plot No. 149 Estate Profit, King's Quarter, St. Croix, U.S. Virgin Islands, containing .80 U.S. acres, more or less, as shown on P.W.D. Drawing No. 3054, dated August 16, 1971. (For metes and bounds, see P.W.D. No. 3054 filed with D.P.W. and Document No. 2682/1972 filed with the Recorder.)

9. Plot No. 150 Estate Profit, King's Quarter, St. Croix, U.S. Virgin Islands, containing 55.7251 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 3398-A; provided, however, boundary descriptions and acreage may change due to inaccuracies in P.W.D. No. 3398-A as a result of a failure to indicate Plots 138 and 139 Estate Profit on said plan.)

10. All of the Grantor's rights of re-entry as set forth in a Quitclaim Deed with Reversion dated February 24, 1987, recorded March 9, 1987 in P.C. 227, Page 311, as Document No. 1016 with respect to Plot 151 Estate Profit, King's Quarter, St. Croix, U.S. Virgin Islands containing 16.3319 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (For metes and bounds, see P.W.D. No. 3398-A filed with D.P.W.)

11. Plot No. 1 Estate Anguilla, King's Quarter, St. Croix, U.S. Virgin Islands, containing 442.714 U.S. acres, more or less as shown on P.W.D. Drawing No. _____ dated _____, 1989 portions of which are filled land and formerly comprised a portion of Krause Lagoon together with its surrounding lands, marshes, islets, swampland and adjacent tidal flats (collectively, "Krause Lagoon"), the southerly coastal boundary of said Plot being the low water mark of the Caribbean Sea as it existed on May 16, 1962. (For metes an bounds, see P.W.D. No. 3398 filed with D.P.W.)

12. Plot No. 1 Estate Annaberg and Shannon Grove, King's Quarter, St. Croix, U.S. Virgin Islands, containing 123.99C U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 3398-A filed with D.P.W.)

-2-

13. A certain parcel of land located in Estate Annaberg and Shannon Grove, St. Croix, U.S. Virgin Islands, bordered to the East and West by the boundaries of the plots of land in Estate Profit identified as Plots 1 through 132 and Well Plot on P.W.D. Drawing No. 997 and to the North and South by a Two Hundred foot (200') prolongation in the westerly direction of the north and south boundaries, of a road fifty feet (50') wide adjoining Plots 25, 26 and 51 through 61, as shown on said P.W.D No. 997, consisting of .20 U.S. acres, more or less. (Note: Parcel description should change to Plot No. 3 Estate Annaberg and Shannon Grove as shown on P.W.D. Drawing No. _____ dated _____, 1989. For metes and bounds, see Document No. 2135B/1963 filed with the Recorder.)

14. Plot No. 2 Estate Annaberg and Shannon Grove, King's Quarter, St. Croix, U.S. Virgin Islands, containing 360.566 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989, portions of which are filled land and formerly comprised a portion of Krause Lagoon, the southerly coastal boundary of said Plot being the low water mark of the Caribbean Sea as it existed on May 16, 1962. (For metes and bounds, see P.W.D. No. 339 filed with D.P.W.)

15. Plot No. 1 Estate Spanish Town, King's Quarter, St. Croix, U.S. Virgin Islands, containing 118.904 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see P.W.D. No. 3398-A filed with D.P.W.)

16. Plot No. 3 Estate Spanish Town, King's Quarter, St. Croix, U.S. Virgin Islands, containing 20.885 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (For metes and bounds, see P.W.D No. 3398-A filed with D.P.W.)

17. Road Plot No. 4 Estate Spanish Town, King's Quarter, St. Croix, U.S. Virgin Islands, containing 0.918 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (See Document No. 4402/1979 filed with the Recorder for a general grant of rights of w over all roads in the Subdivision of Spanish Town.)

18. Road Plot No. 5 Estate Spanish Town, King's Quarter, St. Croix, U.S. Virgin Islands, containing 0.437 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (See Document No. 4402/1979 filed with the Recorder for a general grant of rights of v over all roads in the Subdivision of Spanish Town.)

19. Road Plot No. 6 Estate Spanish Town, King's Quarter, St. Croix, U.S. Virgin Islands, containing 6.170 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____, dated _____, 1989. (For metes and bounds, see Document No. 2682/1972 filed with the Recorder. This Road Plot is called Road Plot No. 1 Estate Spanish Town in said Document. Also note that the triangular parcel in the Northeast corner of Spanish Town, currently shown as part of Road Plot No. 4 Estate Spainsh Town, is <u>included</u> in this Road Plot.)

20. Road Plot No. 3 Estate Annaberg and Shannon Grove, King's Quarter, St. Croix, U.S. Virgin Islands, containing 1.628 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (Note:  This Road Plot should cease to exist inasmuch as Plot 148 Estate Profit as shown on P.W.D. No. 3054 filed with D.P.W. comprises the recorded grant of this Road Plot as an easement to the Government and as described in Document No. 2682/1972 filed with the Recorder.)

21. Road Plot No. 4 Estate Annaberg and Shannon Grove, King's Quarter, St. Croix, U.S. Virgin Islands, containing 4.721 U.S. acres, more or less, as shown on P.W.D. Drawing No. _____ dated _____, 1989. (Note:  This Road Plot should cease to exist inasmuch as Plots 139 and 149 Estate Profit as shown on P.W.D. No. 2011 and P.W.D. No. 3054 filed with D.P.W. comprise the recorded grant of this Road Plot, plus an extension to the border of Plot No. 133 Estate Profit.)

22. Plot No. 5 Estate Blessing, King's Quarter, St. Croix, U.S. Virgin Islands, containing 167.451 U.S. acres, more or less as shown on P.W.D. Drawing No. _____ dated _____, 1989, portions of which are filled land and formerly comprised a portion of Krause Lagoon, the southerl coastal boundary of said Plot being the low water mark of the Caribbean Sea as it existed on May 16, 1962. (For mete and bounds, see P.W.D. No. 3398-I filed with D.P.W., but confirm Northerly and Easterly boundaries by reference to Document No. 3785/1968 filed with the Recorder.)

23. Plot No. 6 Estate Blessing, King's Quarter, St. Croix, U.S. Virgin Islands, containing 16.508 U.S. acres, more or less as shown on P.W.D. Drawing No. _____ dated _____, 1989, portions of which are filled land and formerly comprised a portion of Krause Lagoon, the souther coastal boundary of said Plot being the low water mark of the Caribbean Sea as it existed on May 16, 1962. (For met and bounds, see P.W.D. No. 3398-I filed with D.P.W., but confirm Easterly boundary by reference to Document No. 3785/1968 filed with the Recorder.)

-4-

24.   Road Plot No. 7 Estate Blessing, King's Quarter, St.
      Croix, U.S. Virgin Islands, containing 2.875 U.S.
      acres, more or less, as shown on P.W.D. Drawing No.
      _____ dated _____, 1989.  (For
      metes and bounds, see P.W.D. No. 3398-I filed with
      D.P.W., but confirm Northerly and Easterly
      boundaries by reference to Document No. 3785/1968
      filed with the Recorder.)

25.   A twenty-five foot (25') wide retained easement over
      the 25 Acre Public Port Site for an access road to
      the end of a dike as described in a Quitclaim Deed
      and Access Road Easement dated January 10, 1967,
      recorded January 25, 1967 in P.C. 46, Page 112, as
      Document No. 359 and as shown on P.W.D. Drawing No.
      359/1967 filed with the Recorder.)

26.   A twenty-five foot (25') wide retained easement over
      the 25 Acre Public Port Site for a salt water intake
      channel as described in a Quitclaim Deed and Access
      Road Easement dated January 10, 1967, recorded
      January 25, 1967 in P.C. 26, Page 112, as Document
      No. 359 and shown on P.W.D. Drawing No. _____, dated
      _____, 1989.  (For metes and bounds, see P.W.D.
      No. 2023 filed with D.P.W. and Document No. 359/1967
      filed with the Recorder.)

As the foregoing may be revised by reason of the "New
Survey" (as defined in Section 3.03 of the Agreement).


SUBJECT, HOWEVER, TO THE FOLLOWING:

1.   "Permitted Exceptions" as defined in Section 1.33 of
     the Agreement.

Exhibit 3.01(a)

## QUITCLAIM DEED

THIS QUITCLAIM DEED, made this ＿＿ day of ＿＿＿＿, 1989, by MARTIN MARIETTA ALUMINUM PROPERTIES, INC. ("Martin Marietta"), a Delaware corporation whose mailing address is 6801 Rockledge Drive, Bethesda, Maryland 20817, and VIRGIN ISLANDS ALUMINA, INC. ("VIA"), a United States Virgin Islands corporation whose mailing address is Law Offices of Winston Hodge, Esq., 35 King Street, Christiansted, St. Croix, U.S. Virgin Islands 00820;

W I T N E S S E T H:

That Martin Marietta, for and in consideration of the sum of FORTY FIVE MILLION U.S. DOLLARS (U.S. $45,000,000.00) and other good and valuable consideration, receipt of which is hereby acknowledged, does by these presents hereby remise, release and forever quitclaim to VIA, all of Martin Marietta's right, title, interest, claim and demand in that certain real property situated in St. Croix, U.S. Virgin Islands, as described in Exhibit 1, attached hereto and made a part hereof by reference;

TOGETHER with all of Martin Marietta's interest in the improvements, tenements, hereditaments and appurtenances thereunto belonging;

TO HAVE AND TO HOLD, said right, title, interest, claim and demand of Martin Marietta unto VIA and to its heirs and assigns forever.

IN WITNESS WHEREOF, Martin Marietta has duly executed this deed the day and year first above written.

WITNESSES:                          MARTIN MARIETTA ALUMINUM
                                        PROPERTIES, INC.

_____        By: _____
                                        David C. Dressler,
_____                President


STATE OF MARYLAND    )
                     )  ss.:
COUNTY OF MONTGOMERY)

          The foregoing instrument was acknowledged before
me this ____ day of _____, 1989, by David C. Dressler, as
President of Martin Marietta Aluminum Properties, Inc., a
Delaware corporation, on behalf of said corporation.


                               _____
                                    Notary Public


2

Exhibit 3.01(b)

BILL OF SALE AND GENERAL ASSIGNMENT

WHEREAS, Virgin Islands Alumina, Inc., a United States Virgin Islands corporation ("Purchaser") has entered into an Asset Purchase Agreement dated as of April __, 1989 (the "Agreement") by and between Martin Marietta Aluminum Properties, Inc., a Delaware corporation, ("Seller") and Purchaser, providing for the sale by Seller to Purchaser of certain assets, properties and rights of Seller.

NOW, THEREFORE, Seller, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, for itself and its successors and assigns, has bargained, sold, conveyed, assigned, transferred and delivered and by these presents does sell, convey, assign, transfer and deliver or cause to be sold, conveyed, assigned, transferred and delivered to Purchaser, its successors and assigns, free and clear of all Liens other than the Permitted Exceptions with respect thereto, all of the Inventory, Records, Facility Equipment and Facility Intellectual Property.

TO HAVE AND TO HOLD the same unto the Purchaser, its successors and assigns forever.

Unless otherwise defined herein, capitalized terms shall have the meanings ascribed thereto in the Agreement.

Nothing herein contained shall be deemed to release Seller in any way of its obligations under the Agreement other than those performed by this instrument.

Seller agrees, at any time and from time to time after delivery hereof, upon the request of Purchaser, to do, execute, acknowledge and deliver, or to cause to be done, executed, acknowledged and delivered, all such further, acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required for the more effective assigning, transferring, granting, conveying, assuring and confirming to Purchaser, or to its successors and assigns, of any of the assets, properties and rights acquired by Purchaser hereunder.

IN WITNESS WHEREOF, the Seller has caused this instrument to be duly executed by its duly authorized officers and its corporate seal to be hereunto affixed on this _____ day of May, 1989.

MARTIN MARIETTA ALUMINUM
PROPERTIES, INC., a
Delaware Corporation

By: _____
David Dressler
President

2

Exhibit 3.01(c)

## A S S I G N M E N T

## U.S. LETTERS PATENT

THIS ASSIGNMENT, made this _____ day of _____, 1989, by MARTIN MARIETTA ALUMINUM PROPERTIES, INC., a Delaware corporation with principal offices at 6801 Rockledge Drive, Bethesda, Maryland 20817 (hereinafter referred to as "ASSIGNOR");

WITNESSETH:

WHEREAS, ASSIGNOR is the owner of the entire right, title and interest in and to the invention disclosed and claimed in United States Letters Patent No. 4,083,925, issued April 11, 1978; and

WHEREAS, VIRGIN ISLANDS ALUMINA, INC., a United States Virgin Islands corporation having its principal offices at _____ _____ (hereinafter referred to as "ASSIGNEE"), is desirous of acquiring the full right, title, and interest in, to and under the said United States Letters Patent and invention in the United States;

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, ASSIGNOR does hereby sell, assign and transfer unto ASSIGNEE, its successors or assigns, the entire right, title and interest in and to the invention, and in, to and

under the said United States Letters Patent and any reissue, modifications and extensions thereof.

Further, ASSIGNOR hereby agrees to communicate to ASSIGNEE, its successors or assigns, any facts relating to said invention and Letters Patent, to testify in any legal proceedings, sign all lawful papers, execute all divisional, continuation, substitution, renewal and reissue applications, to execute all necessary assignment papers to cause any and all of said Letters Patent to be issued to said ASSIGNEE, and generally to aid said ASSIGNEE, its successors or assigns, to obtain and enforce proper protection for said invention in the United States of America.

ALL OF THE FOREGOING to be held and enjoyed by ASSIGNEE for its own use and for the use of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by ASSIGNOR if this transfer to ASSIGNEE had not been made.

MARTIN MARIETTA ALUMINUM PROPERTIES, INC. hereby covenants that it has full right to convey the entire interest assigned and that it has not executed and will not execute any agreement in conflict herewith.

IN WITNESS WHEREOF, MARTIN MARIETTA ALUMINUM PROPERTIES, INC. has caused these presents to be signed by its representative thereunto duly authorized.

MARTIN MARIETTA ALUMINUM PROPERTIES, IN

By:_____

Name:_____

Title:_____

STATE OF          )
                  )  ss:
COUNTY OF         )

On this _____ day of _____, 1989, before me, the undersigned officer, personally appeared _____ who acknowledged himself to be the _____ of Martin Marietta Aluminum Properties, Inc., a corporation, and that he, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contain by signing the name of the corporation by himself as _____

In witness whereof I hereunto set my hand and official sea

_____
Notary Public

3

Exhibit 3.01(d)

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

AGREEMENT, made as of the ____ day of _____, 1989, between Martin Marietta Aluminum Properties, Inc., a Delaware corporation, ("Assignor"), and Virgin Islands Alumina, Inc., a Virgin Islands Corporation, ("Assignee").

WHEREAS, Assignor is a party in, to and under certain Contracts, as such term is defined in Section 1.08 of that certain agreement between Assignor and Assignee dated as of April 26, 1989 (the "Agreement");

WHEREAS, as contemplated in the Agreement, Assignee desires to obtain the Assignor's interests in and to assume certain of the Assignor's obligations under the Contracts identified in Exhibit A which is attached hereto and by this reference incorporated herein (such Contracts identified in Exhibit A being hereinafter collectively referred to as the "Assumed Contracts");

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth and other good and valuable consideration, Assignor and Assignee agree as follows:

1.   Assignor hereby assigns to Assignee all of Assignor's right, title and interest in, to and under the Assumed Contracts.

2.    Assignee hereby accepts said assignments and agrees to assume all of the performance obligations of Assignor under the Assumed Contracts from and after the date hereof to the ends of the terms thereof or of any renewals thereof and during said periods to perform and observe all of the covenants, agreements, conditions and other provisions of the Assumed Contracts, which are to be performed and observed on the part of the Assignor thereunder during said periods; provided, however, that such assumption shall be effective only from and after the date hereof, and that Assignee is not assuming any liability or obligation of Assignor relating to or arising from Assignor's performance of, or failure to perform, any of Assignor's obligations under the Assumed Contracts prior to the date hereof.

3.    The foregoing assumption shall not deprive the Assignee of its right to assert, as against the recipient or recipients of the performance of an assumed obligation, any defense available at law of in equity or otherwise to the validity or enforceability of any such obligation or obligations.

2

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be executed by their respective duly authorized officers as of the date and year first above written.

MARTIN MARIETTA ALUMINUM
PROPERTIES, INC.

(Seal)

ATTEST:

By:_____     By:_____
                                  David Dressler
                                  President

VIRGIN ISLANDS ALUMINA, INC.

ATTEST:

By:_____     By:_____
                                  Simon Trinca
                                  Vice President

3

Exhibit 8.01(c)

_____ __, 1989


Martin Marietta Aluminum Properties, Inc.
c/o Martin Marietta Corporation
6801 Rockledge Drive
Bethesda, Maryland  28017

Attn:  President

    Re:  Purchase and Sale of The Martin
        Marietta Alumina Refinery_____

Gentlemen:

       We have acted as counsel for Virgin Islands
Alumina, Inc. a United States Virgin Islands corporation
("Purchaser"), in connection with the negotiation, execu-
tion and delivery of that certain Asset Purchase Agreement
dated as of April 26, 1989 (the "Agreement") between
Purchaser and Martin Marietta Aluminum Properties, Inc., a
Delaware corporation ("Seller"), and the consummation of
the transactions contemplated by the Agreement.  This
opinion is being furnished pursuant to Section 8.01(c) of
the Agreement.  We have also acted as counsel to Clarendon,
Ltd., a corporation organized under the laws of Switzerland
("Clarendon"), in connection with Clarendon's execution
and delivery of that certain guarantee dated April 26,
1989 (the "Guarantee") of Purchaser's obligations under
the Agreement.

Page 2

Capitalized terms used herein shall, unless otherwise defined herein, have the meanings set forth in the Agreement.

We express no opinion regarding any laws other than those of the USVI, Switzerland, and the State of New York.  With respect to opinions contained herein regarding the laws of the USVI and Switzerland, we have relied, respectively, upon the opinions of Winston A. Hodge, P.C., and _____, a copy of each of which is attached hereto.  We consider it reasonable for us and you to rely upon the opinions of Winston A. Hodge, P.C. and _____.

In rendering the opinions set forth below with respect to the Agreement we have assumed that the Agreement has been duly authorized, executed and delivered by Seller and that the Guarantee dated April 26, 1989 of Martin Marietta Corporation has been duly authorized, executed and delivered by Martin Marietta Corporation.  In addition, the opinions set forth below are qualified to the extent that the enforceability of the obligations of the Purchaser under the Agreement and Clarendon under the Guarantee are subject to (i) applicable bankruptcy, insolvency, reorgani-

Page 3

zation, moratorium and similar laws affecting the enforce-
ability of creditors' rights and (ii) general principles
of equity.

We have relied, as to certain factual matters
not otherwise within our actual knowledge, on certificates
of governmental officials and officers or directors of
Purchaser or Clarendon.  We have assumed that the signa-
tures on all documents examined by us are genuine, that
all documents submitted to us as originals are authentic
and that all documents submitted to us as certified or
photostatic copies conform with the originals, which
assumptions we have not independently verified.

Based upon and subject to the foregoing, we are
of the opinion that:

1.    Purchaser is a corporation duly organized,
validly existing and in good standing under the laws of
the USVI.  Clarendon is a Corporation duly organized,
validly existing and in good standing under the laws of
Switzerland.

2.    Purchaser has all requisite corporate power
and authority to enter into the Agreement and to carry out

Page 4

the transactions provided for in the Agreement.  The
execution and delivery of the Agreement by Purchaser and
the performance by Purchaser of its obligations thereunder
have been duly and validly authorized by all necessary
corporate action, and the Agreement has been duly executed
and delivered by Purchaser and constitutes the legal,
valid and binding obligation of Purchaser enforceable
against Purchaser in accordance with its terms.

3.   Clarendon has all requisite corporate power
and authority to enter into and to carry out the Guarantee.
The execution and delivery of the Guarantee by Clarendon
and the performance by Clarendon of its obligations
thereunder have been duly and validly authorized by all
necessary corporate action, and the Guarantee has been
duly executed and delivered by Clarendon and constitutes
the legal, valid and binding obligation of Clarendon
enforceable against Clarendon in accordance with its
terms.

In all respects, this opinion is rendered and
effective only as of the date hereof, is solely for your
information and may not be quoted in whole or in part or

Page 5

relied upon by any other person or entity or for any other purpose, without our prior written consent.

Very truly yours,

CURTIS, MALLET-PREVOST

COLT AND MOSLE

Exhibit 8.02(h)

_____ __, 1989

Virgin Islands Alumina, Inc.
_____
_____
_____

Attn: _____

Re:  Purchase and Sale of The Martin
     Marietta Alumina Refinery

Gentlemen:

　　　We have acted as special counsel for Martin
Marietta Aluminum Properties, Inc., a Delaware corporation
("Seller"), in connection with the negotiation, execution
and delivery of the certain Asset Purchase Agreement dated
as of April __, 1989 (the "Agreement") between Seller and
Virgin Islands Alumina, Inc., a United States Virgin
Islands corporation ("Purchaser"), and the consummation of
the transactions contemplated by the Agreement.

　　　We have also acted as special counsel to Martin
Marietta Corporation, a Maryland corporation and the
parent of Seller ("Martin Marietta"), in connection with
Martin Marietta's execution and delivery of the guarantee
dated April 26, 1989 (the "Guarantee") of Seller's obliga-
tions under the Agreement.

Page 2

This opinion is being furnished pursuant to Section 8.02(h) of the Agreement.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth in the Agreement.  We express no opinion regarding any laws other than those of the USVI, the States of Delaware, Maryland and New York and the United States of America.  With respect to opinions contained herein regarding the laws of the USVI and the State of Maryland, we have relied, respectively, upon the opinions of Messrs. Dudley, Topper & Feuerzeig and the General Counsel or an Associate General Counsel of Martin Marietta, a copy of each of which is attached hereto.  We consider it reasonable for us and you to rely upon such opinions.

In rendering the opinions set forth below with respect to the Agreement we have assumed that the Agreement has been duly authorized, executed and delivered by Purchaser and that the Guarantee dated April 26, 1989 of Clarendon, Ltd. has been duly authorized, executed and delivered by Clarendon Ltd.  In addition, the opinions set forth below are qualified to the extent that the enforceability of the obligations of the Seller under the

<u>Page 3</u>

Agreement and Martin Marietta under the Guarantee are subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws generally affecting the enforceability of creditors' rights and (ii) general principles of equity.

We have relied, as to certain factual matters not otherwise within our knowledge, on certificates of governmental officials and officers of Seller and Martin Marietta. We have assumed that the signatures on all documents examined by us are genuine, that all documents submitted to us as originals are authentic and that all documents submitted to us as certified or photostatic copies conform with the originals, which assumptions we have not independently verified.

Based upon and subject to the foregoing, we are of the opinion that:

1.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business in the USVI, and Martin Marietta is a corporation duly

Page 4

organized, validly existing and in good standing under the
laws of the State of Maryland.

2.  Seller has all requisite corporate power
and authority to enter into, and to carry out the transac-
tions provided for, in the Agreement.  The execution and
delivery of the Agreement by Seller and the performance by
Seller of its obligations thereunder have been duly and
validly authorized by all necessary corporate action, and
the Agreement has been duly executed and delivered by
Seller and constitutes the legal, valid and binding
obligation of Seller enforceable against Seller in accord-
ance with its terms.

3.  Martin Marietta has all requisite corporate
power and authority to enter into and to carry out the
Guarantee.  The execution and delivery of the Guarantee by
Martin Marietta and the performance by Martin Marietta of
its obligations thereunder have been duly and validly
authorized by all necessary corporate action, and the
Guarantee has been duly executed and delivered by Martin
Marietta and constitutes the legal, valid and binding
obligation of Martin Marietta enforceable against Martin
Marietta in accordance with its terms.

Page 5

4.    Neither the execution and delivery by Seller of the Agreement, the consummation by Seller of the transactions contemplated thereby nor compliance by Seller with any of the provisions thereof does or will violate or conflict with the Certificate of Incorporation or By-laws of Seller as in effect on the date hereof.

5.    To our knowledge, without independent investigation and except as set forth in the Disclosure Schedule or otherwise disclosed to the Purchaser in writing, there is no action, suit or proceeding pending before any federal, USVI or New York State Court, at law or in equity, to enjoin any of the transactions contemplated by the Agreement.

6.    No consent, authorization, order or approval of, or filing or registration with, the government of the USVI, the United States government, or the States of Delaware, Maryland or New York which has not been obtained or made will be required in connection with the execution, delivery and performance of the Agreement by Seller or the execution, delivery and performance of the Guarantee by Martin Marietta.

Page 6

7.   The Deed, the Bill of Sale, the Contract Assignment and the FIP Assignment are in proper form under USVI law and have been duly executed and delivered by Seller.

In all respects, this opinion is rendered and effective only as of the date hereof, is solely for your information and may not be quoted in whole or in part or relied upon by any other person or entity or for any other purpose, without our prior written consent.

Very truly yours,

DEWEY, BALLANTINE, BUSHBY, PALMER AND WOOD

Exhibit2

This GUARANTEE, made on this 26th day of April, 1989, by Clarendon, Ltd. (the "Guarantor"), a corporation organized under the laws of Switzerland, to Martin Marietta Aluminum Properties, Inc. ("MMAPI"), a Delaware corporation.

WHEREAS, Virgin Islands Alumina, Inc., a United States Virgin Islands Corporation ("VIALCO") and a subsidiary of Guarantor, is on the date hereof entering into an Asset Purchase Agreement dated as of April 26, 1989 with MMAPI (the "Agreement");

WHEREAS, to induce MMAPI to enter into the Agreement and to induce Martin Marietta Corporation, a corporation organized under the laws of Maryland, to provide its guarantee of MMAPI's obligations to VIALCO, the Guarantor is willing to provide its Guarantee of VIALCO's obligations to MMAPI;

NOW, THEREFORE, The Guarantor hereby agrees as follows:

The Guarantor hereby (i) unconditionally guarantees, as primary obligor and not merely as surety, the timely performance and payment by VIALCO of all of VIALCO's obligations to MMAPI under or in connection with the Agreement and (ii) agrees to be bound by Sections 7.02, 7.03, 17.01 and 17.02 of the Agreement as if it were the purchaser thereunder.

The obligations of the Guarantor hereunder shall not in any way be affected, released or exonerated by (i) the taking of or the failure to take any action against VIALCO or Guarantor as the case may be or any other circumstances which might otherwise constitute a legal or equitable discharge or defense of the Guarantor or (ii) any amendment of the Agreement. MMAPI shall not be required to make demand for payment or performance first against any other person, firm or corporation before resorting to the Guarantor for performance. This Guarantee is intended to be and shall be construed as a continuing guarantee and shall remain in full force and effect for so long as the Agreement shall remain in effect or there shall exist any liability or obligations of VIALCO to MMAPI thereunder. The Guarantor shall not in any way effect, or cause or permit to be effected, the assignment or transfer of any of its obligations hereunder without

the express written consent of MMAPI and Martin Marietta
Corporation.  Guarantor shall pay to MMAPI all reasonable
costs and expenses, including attorney's fees, incurred by
it in enforcing the Agreement or this Guarantee.

CLARENDON, LTD.

By _____

2